# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF TEXAS

# EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Crim. No.  EP-20-CR-0389-DCG** |
| **v.** | ) | |
| | ) | |
| **PATRICK CRUSIUS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MOTION TO SET SCHEDULE ENSURING THAT PATRICK CRUSIUS RECEIVES EFFECTIVE ASSISTANCE OF DEFENSE COUNSEL WITH RESPECT TO THE QUESTION OF WHETHER THE DEATH PENALTY SHOULD BE SOUGHT

PLEASE TAKE NOTICE that **PATRICK CRUSIUS,** by and through his counsel, David A. Lane, hereby files this *MOTION TO SET SCHEDULE ENSURING THAT PATRICK CRUSIUS RECEIVES EFFECTIVE ASSISTANCE OF DEFENSE COUNSEL WITH RESPECT TO THE QUESTION OF WHETHER THE DEATH PENALTY SHOULD BE SOUGHT.* Mr. Crusius requests that this Court enter an order stating that the schedule for Mr. Crusius's pre-authorization mitigation presentation to the Government will be discussed at the status conference schedule for October and abating the defense obligation to present mitigation evidence to the government until such time as investigation can resume and counsel can be constitutionally effective in making a presentation of mitigation to the Government that will bear on the decision whether to seek the death penalty.

This motion is necessary to render effective assistance of counsel in the midst of the extraordinary circumstances of the global COVID-19 pandemic, which has devastated the defense ability to conduct a competent mitigation investigation.   Any death penalty authorization by the government that would enter under these circumstances, with counsel unable to conduct a mitigation investigation, would be violative of Mr. Crusius's constitutional rights guaranteed by the Fifth, Sixth, and Eighth Amendments.

The Government opposes this Request.

In support of this Motion, Mr. Crusius states:

## OVERVIEW

1.     Even though this Court and Chief Judge Orlando Garcia have found that the COVID-19 national emergency poses unavoidable exigent circumstances including "the severity of the risk to those who would otherwise be required to work in close quarters" and concerns for "the health and safety of the public, Court employees, staff of other entities with whom the Court personnel interact, litigants, including defendants in criminal matters, counsel" and others; and even though this Court has already ruled that the "best interests of the public" are served by a continuance of these proceedings until at least the status conference on October 7, 2020,[1] the Government has ignored those findings and those orders.

---

[1] ECF Doc. No. 81, *ORDER RESETTING DOCKET CALL* (filed June 26, 2020). This Court cited orders entered by Chief Justice Orlando Garcia dated March 13, March 16, April 15, May 8, and June 18, 2020.  See also the Chief Judge's new Supplemental Order issued on July 2, 2020, July 2, 2020, *Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic*.

2.      The U.S. Attorney for the Western District of Texas has told defense counsel that if they do not present Mr. Crusius's mitigation to the U.S. Attorney by July 30, 2020, the Government will proceed to make its decision about the death penalty without input from defense counsel.[2]

3.      As the Government knows, the COVID-19 pandemic and stay-at-home orders have had a crippling effect on counsel's mitigation investigation.[3]

4.      The Government does not have the authority to dispense with Mr. Crusius's constitutional right to the effective assistance of counsel and if the Government did so, any decision to pursue the death penalty would have to be invalidated as an illegitimate, unconstitutional action.

5.      Therefore, Mr. Crusius asks this Court to find that the Government's July 30, 2020 deadline (1) does not "allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought" as required by the CJA Guidelines, Vol. 7, Part A, Chapter 6, § 670(d) and (2) does not constitute a "a reasonable opportunity to present information for the consideration of

---

[2] The Justice Manual is Exhibit A to this Motion and is available at: https://www.justice.gov/jm/jm-9-10000-capital-crimes#9-10.010.  It is referred to herein by Section number. The defense mitigation responsibilities are described below and are found at Title 9-10.080 (U.S. Attorney must provide the defense "a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty.").
[3] *See* EFC Doc. 80, *DEFENSE STATUS REPORT REGARDING IMPACT OF THE PANDEMIC NATIONAL EMERGENCY ON THE PREPARATION OF THE DEFENSE* (filed June 15, 2020). ("Defense Status Report").

the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty" as required by Title 9-10.080 of DOJ's Justice Manual.

6.      Mr. Crusius asks this Court to rule that in place of the Government's unilateral "deadline" for the mitigation presentation/submission, this Court and the parties shall discuss the authorization schedule as one of the topics to be addressed at the status conference on October 7, 2020.    CJA Guidelines, Vol. 7, Part A, Chapter 6, § 670(a),(c),(e)(Exhibit B to this Motion).

**THERE ARE A NUMBER OF "RED-FLAG" MITIGATION THEMES FOR COUNSEL TO INVESTIGATE WHICH REQUIRE MORE TIME TO INVESTIGATE AND DEVELOP AND PREPARE TO SUBMIT TO THE GOVERNMENT, AND THE CIRCUMSTANCES OF THIS CASE COMPEL A GRANT OF MORE TIME FOR INVESTIGATION.**

7.      The United States Supreme Court has ruled unequivocally that when defense counsel identify "red flags" for investigation, counsel are required to investigate them and if counsel do not do so, the death penalty is invalidated as a violation of the defendant's constitutional rights.

8.      In *Rompilla v. Beard*, the U.S. Supreme Court granted punishment-phase relief because trial counsel's failure to examine the State's file on Rompilla's prior convictions, which contained many such "red flags," precluded them from finding "a range of mitigation leads" that no other source had opened up. 545 U.S. 374, 390 (2005).

9.      Mr. Crusius's defense counsel have identified red flags for mitigation that must be investigated and developed prior to making a mitigation presentation to the Department of Justice.  These "red flags" include:

4

- At the time he was brought into police custody minutes after the shootings, according to mental health professionals employed by the jail, Patrick Crusius was in a psychotic state and treated with anti-psychotic medication;

- Patrick Crusius has been diagnosed with severe, lifelong neurological and mental disabilities;

- Patrick Crusius was in special education for much of his schooling.

Although these have been identified as investigation themes, identification of these potential themes barely scratches the surface and substantial mitigation investigation needs to be done.

10.     To date, the defense has conservatively identified dozens of possible mitigation and life history witnesses that must be sought out, contacted, and interviewed via a process that requires time, patience, and finesse.

11.     Preparation for Mr. Crusius's mitigation presentation, when it can commence in earnest, will be extremely time consuming and labor intensive because of the large number and complex nature of the mitigating themes that have emerged during the course of the investigation.  Developing these mitigating themes, of course, requires interviewing life history witnesses and gathering corroborating records. All of these steps must be done in a thorough manner.

12.     Because of the COVID-19 pandemic, as explained further below, Mr. Crusius's attorneys have been wholly unable to even approach completion of this work.

13.     In addition to the countless hours that must be spent with Mr. Crusius himself, the defense must also interview witnesses who will have information about his

early childhood and a wealth of other information that cannot be gathered from Mr. Crusius himself.

14.     Witness interviews must be buttressed by the collection of corroborating records. While many records have been collected, many more are anticipated to be discovered after the interviews can be undertaken.  Potential mitigation witnesses almost always lead investigators to additional records which are then collected, analyzed, and incorporated into the defense mitigation submission to the Department of Justice.

15.     Counsel must gather all of the information necessary to inform experts who will then be in a position to interview Mr. Crusius at the jail and render opinions regarding his mental status at the time of the shootings.  As of now, no experts can accomplish these things, as to date, they have either been under stay-at-home orders from the government or their employers, or they are in a high-risk category for COVID and cannot travel to meet Mr. Crusius.

16.     Two mitigation investigators were brought on board in December 2019, and they began the process by gathering records, meeting the client and family members, and compiling a list of potential witnesses to interview and questions to ask;  however, as described below, the COVID-19 pandemic struck before any of those interviews could be accomplished.  The Indictment was issued on February 6, 2020. The attorney whose primary responsibility is development and presentation of the mitigation case was not appointed until March 13, 2020.

17.     The volume of discovery in this case is tremendous.  Counsel have to date received approximately 819 gigabytes and over 73,000 pages of discovery.  It was not until

late May 2020 that a court order was entered permitting undersigned counsel access to the discovery in the state case, and while that is in process, that material has not even been obtained yet because of its sheer size.

18.     Given the vast amount of discovery, the number of witnesses who require in-person interviews, the number of records that have not yet been identified, and the numerous emerging "red flags" for mitigation, even without the COVID-19 pandemic and resultant stay-at-home orders and travel restrictions, it would be unreasonable to expect defense counsel to be prepared to present a meaningful mitigation presentation by July 30, 2020.

19.     Even if the virus were to disappear today, leaving two or three weeks for counsel to attempt to conduct a competent mitigation investigation, counsel would not be able to satisfy the Government's ultimatum for a July 30, 2020, mitigation presentation. The virus and the stay-at-home orders have been with us for months.  The sheer volume and complexity of the work that remains to be done make it impossible to complete all necessary mitigation-related tasks that would allow the defense to provide the government with a meaningful mitigation presentation in the foreseeable future.

## COUNSEL HAVE BEEN UNABLE TO COMPLETE THE CONSTITUTIONALLY-MANDATED MITIGATION INVESTIGATION UNDER THE GOVERNMENT'S DEADLINE BECAUSE OF THE COVID-19 PANDEMIC AND THE STAY-AT-HOME ORDERS THAT HAVE BEEN IN PLACE FOR MONTHS.

20.     As this Court is well aware, the defense team was put into place just as the COVID-19 global pandemic struck.

21.     The Indictment in this case was returned on February 6, 2020.

22.     On March 13, 2020, the same day that this Court appointed the attorney who will lead Mr. Crusius's mitigation case, the President of the United States declared a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak and the Governor of Texas declared COVID-19 to be a disaster under Section 418.014 of the Texas Government Code.

23.     Beginning in mid-to-late March, Governors in every state in which members of the defense team live and work issued stay-at-home orders and severe health advisories.

24.     As Chief Judge Orlando Garcia observed in his July 2, 2020, *Supplemental Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 Pandemic*, "[t]he state of Texas has seen an increase in COVID-19 cases from 63 on March 15, 2020 to 160,000 as of June 30, 2020."

25.     In an Executive Order issued July 2, 2020, Texas Governor Abbott, citing "substantial increases in COVID-19 positive cases and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19," implemented further measures designed to reduce the spread of the virus and attempt to avoid even more extreme measures.[4]

---

[4] Governor of the State of Texas, Executive Order GA-29 *Relating to the use of face coverings during the COVID-19 disaster,* issued July 2, 2020, para. 6, available at https://open.texas.gov/uploads/files/organization/opentexas/EO-GA-29-use-of-face-coverings-during-COVID-19-IMAGE-07-02-2020.pdf (viewed 7/8/2020)See also Governor's Proclamation Extending Disaster Declaration (July 2, 2020), available at https://gov.texas.gov/news/post/governor-abbott-extends-disaster-declaration-4 (viewed 7/8/2020).

26.     Mr. Crusius incorporates by reference the information he provided in ECF Doc. 80, *DEFENSE STATUS REPORT REGARDING IMPACT OF THE PANDEMIC NATIONAL EMERGENCY ON THE PREPARATION OF THE DEFENSE*, filed June 15, 2020 ("Defense Status Report").  As explained in that document and its Exhibit A (ECF Doc. 80-1), the pandemic has devastated counsel's ability to conduct a mitigation investigation.  Every state in which members of the defense team live, and where every witness in this case resides, has been paralyzed by the pandemic over the past months.

27.     Most defense team members are in vulnerable populations at special risk from the COVID-19 virus, fitting into the "high risk" or "very high risk" categories (for either themselves or a family/household member).  These risk classifications are based both upon, for some team members, age, and for others, existing medical conditions that make them especially vulnerable. For example, lead counsel David Lane is over 65 years of age and therefore is in this classification of the most vulnerable.  Many other members of the team fall under vulnerable and "most vulnerable" classifications or live with someone who does. Some team members' physicians have ordered them to remain at home inside.

28.     The same is true for potential mitigation witnesses and others who need to be interviewed to conduct a constitutionally-sufficient mitigation investigation. People, especially those in Texas where deaths and hospitalizations are spiking, are reasonably afraid to welcome strangers into their home because of their legitimate fears of

transmission of COVID-19.[5] They are not at their workplaces or other locations where such interviews usually take place.

29.     Even as states are beginning to loosen restrictions on movement for the general population, members of vulnerable populations remain at great risk.  For this reason, most orders strongly encourage such persons to remain at home, refrain from travel, and continue social distancing and extreme hygiene measures.  High-risk individuals, especially those 65 and older, are strongly advised to stay at home to save their lives.  The Texas Health and Human Services Department issued the following on May 1, 2020:

### SPECIAL GUIDANCE FOR TEXANS OVER 65

**People 65 years or older, especially people 65 years or older with medical issues like heart disease, diabetes, cancer, or a weakened immune system, are at a higher risk for getting very sick or dying from COVID-19**. Every Texan is part of the solution. Strictly adhere to all CDC guidelines, as well as all recommendations in this document.

**STAY HOME IF YOU CAN**.

---

[5] A CBS News Poll in late April reported that 70% of Americans say keeping people home and social distancing should continue to be the nation's top priority and only 13% say they would definitely return to public places over the next few weeks if restrictions were lifted. A. Salvanto, J. De Pinto, F. Backus and K. Khanna, "Americans prioritize staying home and worry restrictions will lift too fast," CBS News poll (April 23, 2020), CBS Online, https://www.cbsnews.com/news/americans-prioritize-staying-home-and-worry-restrictions-will-lift-too-fast-cbs-news-poll/  (viewed 7/2/20).  *See* John Haltiwanger, "In an era of political polarization, Americans are united behind coronavirus stay-at-home orders, polling shows." Business Insider Online (April 23, 2020)(reporting on numerous polls asking similar questions), https://www.businessinsider.com/americans-united-behind-coronavirus-stay-at-home-orders-polling-shows-2020-4 (viewed 7/2/2020).

State of Texas Health and Human Services, Texas Department of State Health Services, "Opening the State of Texas:  Minimum Recommended Health Protocols (PDF's)" (emphasis in original).[6]

30.    Texas Governor Abbott's Executive Orders "strongly" encourage persons over the age of 65 and vulnerable populations to stay at home as much as possible, to maintain distance from any household member who has been outside the residence within the past fourteen days, and to practice other health and safety measures.[7]  GA-28, like every order before it, instructs Texans who fall under a vulnerable population that they should follow the minimum standard health protocols issued by the Texas Department of State Health Services.[8]

31.    Similar orders are in place in every state in which defense team members, family members, and potential witnesses reside, and such orders have been in place for over three months.

32.    On June 25, 2020, "[a]mid a frightening spike in COVID-19-related hospitalizations," Texas Governor Greg Abbott paused further business reopenings, ordered a limit on elective surgeries in many of the state's most populous counties, and warned all Texas residents to stay at home.[9]  As of June 26, 2020, Texas had broken its

---

[6] https://www.dshs.state.tx.us/coronavirus/opentexas.aspx (viewed June 14, 2020).
[7] See Executive Order GA-28, issued by Governor Greg Abbott on June 26, 2020, *Relating to the expanded reopening of Texas in response to the COVID-19 disaster* (pages 3-4). https://gov.texas.gov/coronavirus
[8] *Id.,* pages 3-4.
[9] J. Moritz, "Abbott pauses reopenings, limits elective surgeries to make room for more COVID-19 cases," El Paso Times (online ed.), June 25, 2020, available at: https://www.elpasotimes.com/story/news/local/texas/state-bureau/2020/06/25/abbott-pauses-reopenings-democrats-fault-him-covid-19-spike/3249617001/ (viewed 7/2/2020); *see also* P.

own record for hospitalizations every day for fourteen days.[10] Governor Abbott closed bars and other businesses, and placed additional restrictions throughout the state.[11]  On July 2, 2020, Texas set another record for COVID-19 hospitalizations (7,382).[12]  Hospital beds in El Paso and Bexar Counties were filled to 79% and 77%, respectively, of capacity, while those in the Dallas Fort-Worth area were filled to 83% of capacity.[13]  On June 29, 2020, El Paso officials reported a COVID-19 outbreak at the El Paso County jail downtown.[14]  On July 7, 2020, Texas reached record numbers in three key COVID-19 statistics: new daily cases (10,028), new daily deaths (60) and all-time high in hospitalizations at one time

---

Svitek, "Gov. Greg Abbott recommends Texans stay home as coronavirus cases surge," El Paso Times (online ed.), June 23, 2020, available at: https://www.texastribune.org/2020/06/23/texas-coronavirus-greg-abbott-home/   (warning that Texas COVID-19 cases are rising at an "unacceptable rate," Gov. Abbott recommended that Texans "stay home as much as possible.") (viewed 7/2/2020).

[10] P. Svitek, "Gov. Greg Abbott orders Texas bars to close again and restaurants to reduce to 50% occupancy as coronavirus spreads," Texas Tribune (online), June 26, 2020, available at: https://www.texastribune.org/2020/06/26/texas-bars-restaurants-coronavirus-greg-abbott/ (viewed 7/2/2020).

[11] Executive Order GA-28, issued by Governor Greg Abbott on June 26, 2020, *Relating to the target response to the COVID-19 disaster as part of the opening of Texas,"* available at: https://gov.texas.gov/coronavirus (viewed 7/2/2020).

[12] "U.S. sets record for new Coronavirus Cases, surpassing 54,000," Washington Post (online), July 2, 2020, available at: https://www.washingtonpost.com/nation/2020/07/02/coronavirus-live-updates-us/ (viewed July 2, 2020).

[13] "Coronavirus in Texas," Texas Tribune (online), July 2, 2020, available at: https://apps.texastribune.org/features/2020/texas-coronavirus-cases-map/ (viewed July 2, 2020).

[14] M. Smith, "Dozens of inmates test positive for COVID-19 at El Paso County Jail Downtown, Jail Annex," El Paso Times (online), July 29, 2020, available at: https://www.elpasotimes.com/story/news/2020/06/29/coronavirus-outbreak-el-paso-downtown-jail-annex/3279973001/ (viewed 7/2/2020).

(9,286).[15] (See Exhibit C to this Motion). By July 8, 2020, even that record was broken, with Texas reporting 75 deaths in a 24-hour period Monday-Tuesday, July 6-7, 2020.[16]

33.     The Executive orders and Center for Disease Control ("CDC") Guidelines have restricted people from non-essential contact and interactions with others in person.  It is neither responsible from a public health standpoint nor socially tolerable for a defense investigator or a defense attorney to meet in-person with witnesses or potential witnesses at this time. It would be irresponsible and unsafe to ask investigators to attempt witness interviews amidst the "social distancing" recommendations and the instructions to limit contact by the CDC.  It would also be ineffective;  persons who seek to stay safe at home and avoid social contact are not likely to respond well to a defense investigator knocking on their door.

34.     As a result of the pandemic and the ensuing orders, as well as the legitimate fears of potential mitigation witnesses and leads, the defense has been unable to commence the pretrial investigation and interviews necessary for adequate trial preparation.   An adequate defense investigation cannot be conducted in the current crisis. Counsel has been unable to investigate the case, meet with their client, conduct a mitigation investigation, or do any meaningful preparation for trial.

---

[15] B. Lopez, "Texas reaches record 10,028 new COVID-19 cases, an all-time high in hospitalizations, Ft. Worth Star-Telegram (online) (July 7, 2020), available at  https://www.star-telegram.com/news/coronavirus/article244067447.html (viewed 7/8/2020).

[16] R. Henne, "Houston coronavirus updates: What you need to know for July 8," Houston Chronicle (online)(July 8, 2020), available at https://www.chron.com/news/houston-texas/article/Houston-coronavirus-updates-What-you-need-to-15393689.php (viewed 7/8/2020).

35.     Attempts to interview anyone in person stopped on March 13, 2020. This was necessary and appropriate not only for the well-being of the defense team, but also those witnesses whom they might contact. Lay witnesses often provide the most powerful evidence presented in a capital penalty phase, and it is essential to seek out and meet potential witnesses in person, particularly family members. The sharing of difficult, personal family stories requires that the defense team establish rapport, spending time to earn the trust of witnesses and to elicit the necessary family and social history information. As explained in American Bar Association's *Supplementary Guidelines for the Mitigation Function Of Defense Teams in Death Penalty Cases,* these in-person interviews are a core function in a mitigation investigation, one that cannot simply be "skipped over": "Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death."[17] Multiple in-person interviews are required under the ABA Guidelines:

> Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.[18]

---

[17] ABA, Mitigation Guideline 10.11 (C), *Supplementary Guidelines for the Mitigation Function of the Defense Team in Death Penalty Cases*, 31 Hofstra L. Rev. 677 (2008).  Mr. Crusius incorporates by reference ECF Doc. 80-1, *Declaration of Elizabeth Vartkessian, Ph.D.* (May 27, 2020).

[18] *Ibid.*

Such a process is necessarily personal and emotional, must be done in person in order to be effective and competently undertaken, and is time-intensive. "Maximizing the accuracy of information provided in an interview requires the mitigation specialist to build rapport with the witness. … [M]any of the topics that must be explored in a mitigation investigation are highly sensitive."[19]  To attempt to meet with someone in person during this pandemic would not only violate the explicit and unanimous advice of national public health authorities, but also risk impairing the relationship with prospective witnesses by displaying a callous disregard for their and their families' safety. Reports from other capital defense teams who made such attempts at the early phases of social distancing confirm that "attempts at in-person interviews were met with angry responses and requests not to return, creating barriers" to later interviews.[20]

36.    As the expert declaration of Elizabeth Vartkessian (Doc. 80-1) explains in some detail, telephone contacts and interviews do not satisfy the ABA Guidelines and cannot ensure the constitutionally-required effective assistance of counsel.  In a federal habeas case in which the federal courts vacated a Wyoming state death sentence, one testifying expert described the phone-contact investigative technique as "a textbook for how not to do it." *Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512, at *73 (D. Wyo. Nov. 20, 2014), *aff'd sub nom. Eaton v. Pacheco*, 931 F.3d 1009 (10th Cir. 2019).[21]

---

[19] ECF Doc. 80-1, *Declaration of Elizabeth Vartkessian, Ph.D.* (May 27, 2020), at page 10.
[20] *Id.*, at page 13.
[21] The *Eaton v. Wilson* case, the applicable ABA Guidelines, and learned treatises on the subject of capital mitigation practices are all discussed in ECF Doc. 80-1, *Declaration of Elizabeth Vartkessian, Ph.D.* (May 27, 2020), at pages 12-15 and are incorporated herein by reference.

37.    The defense team's attempts to collect relevant life history records are ongoing; however, the COVID-19 emergency has created hurdles that have slowed that process.  Even something as simple as obtaining signatures on release forms is a formidable challenge during this pandemic. As a result, records are still being received and many records have not yet been reviewed or analyzed fully for potential mitigation value for a mitigation submission to the DOJ.

38.    As outlined in more detail in Mr. Crusius's Defense Status Report (Doc. 80), the pandemic has resulted in a cessation of all in-person communications between mitigation investigators, attorneys, and Mr. Crusius. A mitigation investigation cannot competently be conducted without such face-to-face meetings; while telephone calls may be sufficient to maintain an existing relationship, they do not permit meaningful, essential interactive dialogue, the critical opportunity to observe reactions, and they cannot move the mitigation investigation forward.

39.    Around the country, courts are recognizing that COVID-19 has brought preparation of cases to a halt.  On March 30, 2020, in a federal habeas case, a U.S. District Court "[took] notice of the national and statewide COVID-19 emergency and responsive actions . . . [and was] persuaded that notwithstanding his reasonable diligence prior to and during the emergency, petitioner's investigation and preparation of the federal [habeas] petition has been and will be impeded by the extraordinary and unforeseeable circumstances arising from the COVID-19 pandemic as noted in the moving papers." *Cowan v. Davis*, No. 1:19-CV-00745-DAD, 2020 WL 1503423, at *2 (E.D. Cal. Mar. 30, 2020) (unpublished) (citations to the record omitted). The Court found: "The COVID-19

impediment implicates petitioner's right to the assistance of appointed habeas counsel in preparing his petition for federal habeas relief." *Ibid*. Such concerns are multiplied exponentially when the question is whether the Government should seek the death of Mr. Crusius.

40. Even in existing, pending federal death penalty cases that had been set for trial, courts have vacated and continued trials indefinitely because of the pandemic. See e.g., *United States v. John Smith, II*, D. Alaska No. No. 3:16-cr-00086-SLG-1 (Order vacating jury trial that had been set for June 1, 2020)(Exhibit D to this Motion); on July 2, 2020, the court held a status conference and ruled that trial will not commence until at least January 2021 at the earliest; no scheduling or status conference has been set. (Exhibit E to this Motion). Resource counsel has advised counsel that another federal death penalty case, *United States v. Sayfullo Habibullaevic Saipov,* S.D.N.Y. No. 1:17-CR-00722-VSB, is in the same posture; trial had been set for April 13, 2020 but was vacated because of the pandemic. By agreement of the parties and the court, the trial will not be held until at least the fall of 2020 or the winter of 2021.  Another federal death penalty case, *United States v. Robert Bowers*, W.D. Pa. Criminal No. 18-292, is in the same posture, with the trial vacated and no current trial date set as a result of the pandemic. If even authorized cases, even those set for trial, have been delayed because of COVID-19, surely a case like this one -- in the earliest stage with a defense effort in its infancy -- should be on hold.

## THE PRE-AUTHORIZATION PROCESS

41.    "Death penalty certification involves the most fundamental of the rights, the right to life," *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999), therefore, the Sixth Amendment right to counsel attaches to this critical stage. *Id*. at 364. In addition, "since the right to counsel is grounded in procedural due process, … the complete abdication of counsel at a death penalty certification hearing is, concomitantly, a denial of the defendant's due process rights." *Ibid*, *citing Powell v. Alabama*, 287 U.S. 45, 71 (1932).[22]

42.    Indeed, the DOJ Justice Manual provides for representation by counsel throughout the authorization process for any federal prosecution in which the death penalty may be sought as a penalty.  (See Exhibit A to this Motion).

43.    "The overriding goal of the review process is to allow proper individualized consideration of the appropriate factors relevant to each case." Justice Manual, Title 9-10.030. (Exhibit A to this Motion)

44.    In the typical case, defense counsel is provided a year or more to conduct a mitigation investigation and prepare the mitigation presentation.[23] After the defense presentation to the U.S. Attorney in the District where the case is brought, the U.S. Attorney

---

[22] *See also Fetterly v. Paskett*, 997 F.2d 1295, 1300-01 (9th Cir. 1993), *cert. denied*, 513 U.S. 914 (1994), acknowledging that, under the U.S. Constitution, laws or rules designed to assure fairness and protect the substantive rights of defendants create liberty interests, and thus give rise to indirect due process rights.

[23] The average time between indictment and the defense "mitigation" presentation at the Department of Justice is 12.5 months.  Of course, this case is not an average case.  It can only be described as an extraordinary case in terms of size, complexity, and gravity.

considers the information, conducts a supplemental investigation or review as necessary, and then makes a recommendation to DOJ's Capital Case Section. Justice Manual, Title 9-10.080. (Exhibit A to this Motion)

45.     If the U.S. Attorney eventually ends up recommending pursuit of the death penalty, DOJ's Capital Review Committee establishes a date and time for the Committee to meet with defense counsel and representatives of the U.S. Attorney's Office.  The Justice Manual is explicit that "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation." Justice Manual, Title 9-10.130. (Exhibit A to this Motion) The Committee then makes a recommendation to the Attorney General through the Deputy Attorney General, and a final decision is eventually made.  It is only after this process that the death penalty may be formally sought by the Government in this case.

46.     A pivotal point of this process is the requirement that defense counsel be provided "a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty." Justice Manual, Title 9-10.080. (Exhibit A to this Motion). This process is informally referred to as a "mitigation presentation" or "mitigation submission."

47.     Despite defense counsel's good faith efforts to explain to the Government their inability to conduct a mitigation investigation during the COVID-19 pandemic, the Government has stated that if defense counsel are not able to make a mitigation presentation by July 30, 2020, the U.S. Attorney will deem that it has provided "a

reasonable opportunity" and that defense counsel has simply chosen to not take the opportunity to engage in the Title 9-10.080 process.

## THIS COURT HAS THE AUTHORITY TO SET THE SCHEDULE FOR THE DEFENSE TO PRESENT MITIGATING INFORMATION TO THE GOVERNMENT.

48.     It is well established that "[t]he district court is charged with effectuating the speedy and orderly administration of justice." *United States v. Grace*, 526 F.3d 499, 508 (9th Cir. 2008). There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management orders designed to ensure that the parties are adequately and timely prepared so that the proceedings are handled efficiently and intelligibly. *Id.* It follows, therefore, that this Court has the authority to enter a scheduling order to include a date, or to stay a date, for the defense to present mitigating evidence to the government.  As will be seen in more detail below, other courts have granted defense requests for additional time in which to present mitigation cases to the government. *See, e.g., United States v. Benavides and Weber*, 06-62-M-DWM, ECF No. 123 (D. MT., Oct. 10, 2008)(Exhibit F to this Motion); *United States v. Jameson*, No. 18-CR-245-JED-7, ECF No. 338 (N.D. Okla. Dec. 23, 2019)(Exhibit G to this Motion); *United States v. McGill*, 09CR2856-IEG, 2010 WL 1571200 (S.D. Cal., Apr. 16, 2010) (unpublished)(Exhibit H to this Motion).

49.     This Court's authority to establish and manage a schedule of dates for resolution of whether the government will seek the death penalty is expressly set forth in

the Criminal Justice Act Guidelines established by the Judicial Conference of the United States for the administration and operation of the Criminal Justice Act. These CJA Guidelines are designed to fulfill the Sixth Amendment's guarantee to the accused of the right to representation by counsel in serious criminal prosecutions. Volume 7, Part A, Chapter 6 of the Guidelines contains a specific provision addressing this Court's authority. That provision, "Scheduling of Federal Death Penalty Case Authorization to Control Costs," provides:

> (a) Within a reasonable period of time after appointment of counsel under 18 U.S.C. § 3005, and only after consultation with counsel for the government and for the defendant (including, as appropriate, in an *ex parte* application or proceeding), the court should establish a schedule for resolution of whether the government will seek the death penalty.

CJA Guidelines, v. 7, Part A, Chapter 6, § 670(a).[24] The Guideline continues:

> (b) This schedule should include dates for:

>> (1) the submission by the defendant to the U.S. attorney of any reasons why the government should not seek the death penalty;

>> (2) the submission by the U.S. attorney to the appropriate officials of the DOJ of a recommendation and any supporting documentation concerning whether the death penalty should be sought; and

---

[24] This provision is Exhibit B to this Motion and is available at: https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-6-ss-670-scheduling-federal-death-penalty.

(3) filing of a notice under 18 U.S.C. § 3593(a) (link is external) that the government will seek the death penalty, or notification to the court and the defendant that it will not.

(c) *The schedule should be flexible and subject to extension for good cause at the request of either party* (again, as appropriate, in an *ex parte* application or proceeding).

(d) *The schedule should allow reasonable time for counsel for the parties to discharge their respective duties with respect to the question of whether the death penalty should be sought, with due regard to*:

- *the factual complexity of the case;*

- *the status of any continuing investigation of the crimes and related criminal conduct;*

- *the anticipated or actual progress of discovery;*

- *the potential for successful plea negotiations; and*

- *any other relevant factors.*

(e) It is also recognized that *scheduling extensions may be necessary* because the full development of facts related to guilt and aggravating and mitigating factors may continue even after the case is submitted to the DOJ for review.

CJA Guidelines, v. 7, Part A, Chapter 6, § 670 (emphasis added).[25]

50.     The above-emphasized language of Guideline § 670 supports Mr. Crusius's request to vacate the submission date unilaterally declared by the Government.  Vacating the date is necessary to allow Mr. Crusius's counsel to discharge their duties regarding the

---

[25] See preceding footnote and Exhibit B to this motion.

22

decision whether the death penalty should be sought. Defense counsel must be given a reasonable opportunity to present any fact, including mitigating factors, for consideration. *United States v. Pena-Gonzalez*, *supra,* 62 F.Supp.2d at 361. In *Pena-Gonzalez*, *supra,* the district court vacated the certification because defense counsel did not provide representation in the authorization process. In *United States v. Benavides and Weber*, the judge granted defendants' request for more time to prepare for its mitigation presentation to the Government in part because the court found that the discovery supplied would be of little use to the defense without considerable time to assimilate the information. *United States v. Benavides and Weber*, 06-62-M-DWM, ECF No. 123 (D. MT., Oct. 10, 2008)(Exhibit F to this Motion). The district court held it had ample authority "to set a date for each stage of the mitigation presentation." *Id.* at 7. Like the court in *McGill*, the *Benavides* court cited the plain language of the Guidelines and its inherent power to manage its own docket. *Id.* The court explained that, from the perspective of the Judicial Conference, "there is no doubt that such authority exists." *Id.* at 5. The district court added, it is clear from the Guidelines "that the Judicial Conference considers it appropriate for the trial court to intervene with regard to the timing of the mitigation presentation." *Id.* at 6.

51.     In *United States v. McGill*, the judge granted the defense motion requesting it vacate the Government's mitigation submission date and set a schedule delaying the presentation of mitigation evidence to the U.S. Attorney and DOJ's Capital Case Committee.    09CR2856-IEG, 2010 WL 1571200 (S.D. Cal., April 16, 2010) (unpublished)(Exhibit H to this Motion).   The district court noted its authority in unequivocal terms, explaining it "unquestionably has the authority to enter scheduling

orders designed to manage its docket," *id.*, at *2, which in the issue before it, included the

defense mitigation submission to the U.S. Attorney. The *McGill* court relied in large part

upon *United States v. Grace*, 526 F.3d 499, 509 (9th Cir. 2008), which described the district

courts' inherent power to enter pretrial case management orders:

> We begin with the principle that the district court is charged
> with effectuating the speedy and orderly administration of
> justice . . . [I]n carrying out this mandate, a district court has
> the authority to enter pretrial case management and discovery
> orders designed to ensure . . . that the parties have an
> opportunity to engage in appropriate discovery and that the
> parties are adequately and timely prepared so that the trial can
> proceed efficiently and intelligibly.

*Grace,* 526 F.3d at 508-09. The *McGill* court, citing *Grace*, reasoned that entering a

scheduling order delaying the local presentation would "allow for the orderly resolution of

the question of whether the government will seek the death penalty, and will also allow the

parties to efficiently prepare for trial." *McGill*, 2010 WL 1571200 at *3.

52.     In *Pena-Gonzalez, supra*, the court found that the Sixth Amendment right to

counsel attaches to the mitigation submission process because it "is of paramount

importance in a capital case" which "can literally lead to a determination of life or death."

62 F.Supp.2d at 363-64.  In *Pena-Gonzalez*, defense counsel did not make any submission

and did not attend the certification meeting. The Court struck the death penalty

certification.  *See also United States v. Gomez-Olmeda*, 296 F.Supp.2d 71, 78 (D.P.R.

2003) (striking the Government's notice of intent to pursue the death penalty when a

combination of circumstances "rendered the DOJ meeting meaningless").

53.     The same circumstances will exist if the Government proceeds with its July 30, 2020 meeting date.  The July 30th meeting will be "meaningless," because the COVID-19 crisis has prevented any semblance of a thorough, constitutionally mandated mitigation investigation.

54.     When a defendant's life is on the line, the interest of justice far outweigh considerations for speediness. As one court explained:

> The ends of justice require that prosecutors make wise and well-informed decisions on whether to seek the death penalty to guarantee that this ultimate punishment is used only when most appropriate. The Defendants, for obvious reasons, have the utmost interest in making sure that the United States does not make a hasty decision whether they will seek to have them put to death. . . . The public has a similar interest in protecting against the unwarranted use of capital punishment in its name. The gravity of this decision cautions against a process built for speed rather than for justice.

*United States v. Dominguez-Maqueda*, No. CR 06-86 JB, 2006 WL 1308266, at *5 (D.N.M. 2006) (unpublished) (finding that granting the United States additional time to decide whether to seek the death penalty would serve the ends of justice and the interests of the parties and the public).

**A THOROUGH DEFENSE MITIGATION INVESTIGATION PRIOR TO PARTICIPATION IN THE GOVERNMENT'S AUTHORIZATION PROCESS IS REQUIRED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND IS IN THE INTERESTS OF EFFECTIVE JUDICIAL MANAGEMENT OF THE CASE.**

55.     Since the death penalty was reinstated in 1976, the Court has emphasized that death is different. "Death, in its finality, differs more from life imprisonment than a 100-

year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). In order for capital punishment to be lawful, jurors must have the opportunity to hear about the history of the defendant. Because a capital sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death,"[26] the defense team must undertake a broad investigation into the background, character, and history of the capital defendant. In addition to informing the potential sentencer of information critical to rendering a moral decision in a capital case, this investigation also informs trial counsel's strategy concerning motions practice, jury selection, the selection of experts, the focus of the defense's case at guilt, and many other critical aspects of capital defense that extend far beyond sentencing. *See, e.g., Andrus v. Texas*, 140 S.Ct. 1875 (U.S. June 15, 2020) (reversing Texas Court of Criminal Appeals and finding that the capital defense team failed to conduct a reasonable mitigation investigation).

56.    The U.S. Supreme Court has delineated the constitutional standards for adequate investigation and representation regarding a client's life history. These cases explicitly recognize the need to develop a social history through life history witnesses and documentary evidence.

---

[26] *Lockett v. Ohio,* 438 U.S. 586, 604 (1978).

57.     In *Williams v. Taylor*, 529 U.S. 362 (2000)*,* the Supreme Court concluded that counsel's performance was below professional norms because they failed to investigate and discover extensive records describing Mr. Williams' horrific childhood. *Id.*, at 395.

58.     In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court found that counsel rendered ineffective assistance by failing to compile an adequate social history. 539 U.S. at 538. In preparation for the sentencing proceeding, trial counsel investigated and developed mitigating evidence, including "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other." *Id.,* at 516. However, "[at no point did [counsel] proffer any evidence of petitioner's life history or family background." *Id.* In post-conviction proceedings, Wiggins "challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background." *Id.* Wiggins' trial counsel acknowledged that he did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose." *Id.,* at 517. The Supreme Court emphasized that the "failure to uncover and present voluminous mitigating evidence" could not be excused as trial counsel's tactical decision. *Id.,* at 522. Rather, the Court found that trial counsel failed in their obligation to investigate the defendant's history and background thoroughly. *Id.* The Court emphasized counsel's duty to investigate by referring to the ABA Standards for Criminal Justice, noting that the Court

has "long referred" to the ABA standards as "guides to determining what is reasonable." *Id.,* at 524 (internal citation omitted). According to the United States Supreme Court, it is a "well-defined norm" of effective capital representation that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence.'" *Id.* (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1.0 (1989) (ABA Guidelines)).

59.     In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found trial counsel's investigation deficient because they failed to obtain and examine the public files on Rompilla's prior conviction that they knew would be used to support the prosecution's case for a death sentence. *Id.*, at 393. The Court emphasized the importance of obtaining and reviewing life history records more broadly:

> When new counsel entered the case to raise Rompilla's post-conviction claims, however, they identified several likely avenues the trial lawyers could fruitfully have followed in building a mitigation case. School records are one example, which trial counsel never examined in spite of the professed unfamiliarity of the several family members with Rompilla's childhood, and despite counsel's knowledge that Rompilla left school after the ninth grade. Other examples are records of Rompilla's juvenile and adult incarcerations, which counsel did not consult, although they were aware of their client's criminal record.
>
> Moreover, while counsel knew from police reports provided in pretrial discovery that Rompilla had been drinking heavily at the time of his offense . . . and although one of the mental health experts reported that Rompilla's troubles with alcohol merited further investigation . . . counsel did not look for evidence of a history of dependence on alcohol that might have extenuating significance.

*Id.,* at 382. The Court also reiterated that the constitution mandates that reasonably diligent counsel must obtain all available evidence related to the prosecution's case in aggravation. *Id.,* at 385-86. In so holding, the Court again relied on the ABA Standards for Criminal Justice in determining the standard of care. *Id.,* at 387.

60.     In 2009 and 2010, the Supreme Court issued two *per curiam* decisions reiterating the duty of trial counsel to conduct a diligent inquiry into a capital defendant's social background. *Sears v. Upton,* 561 U.S. 945 (2010); *Porter v. McCollum,* 558 U.S. 30 (2009). In *Porter,*

> [t]he judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to gauge his moral culpability accurately. They learned about Porter's turbulent relationship with [the victim], his crimes, and almost nothing else. Had Porter's counsel been effective, the judge and jury would have learned of the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Id.*, at 41 (internal citation omitted). In finding that Porter's trial counsel were ineffective for failing to investigate and present mitigating evidence, the Supreme Court discussed at length the post-conviction testimony of life history witnesses, i.e., two siblings and Porter's company commander during the Korean War. *Id.,* at 449, 450.

61.     Likewise, the Court in *Sears* found that trial counsel were ineffective for conducting a cursory investigation into the petitioner's background. *Sears v. Upton, supra,* 561 U.S. at 951, 954. The Court concluded that there was a reasonable probability that Sears would have received a different sentence had the jury that sentenced him to death heard evidence that emerged during post-conviction proceedings. *Id.,* at 956. That evidence

included information provided by life history witnesses, as well as information contained in documents about Sears' troubled childhood. *Id.,* at 948.

62.     There is no question that should counsel not be able to adequately conduct a mitigation investigation and present mitigation evidence at Mr. Crusius's death penalty authorization hearing, Mr. Crusius would be denied the right to counsel as guaranteed by the Sixth Amendment at arguably the most important proceeding that will determine the course of this case.

63.     As far back as 1998, the "Spencer Report," adopted by the Judicial Conference of the United States, observed that the authorization process "creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence."[27]  The Report notes:

> One of defense counsel's most important functions is to present information first to the local United States Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. … Although the written and oral presentations made to the Death Penalty Review Committee are not as detailed or comprehensive as a penalty phase presentation to a jury, counsel must conduct a wide-ranging preliminary investigation of facts relevant to sentencing *before* the Justice Department makes the decision whether to file a notice seeking the death penalty, if it is to have an effect on the authorization process.[28]

---

[27] Hon. James R. Spencer, et al., Committee on Judicial Services of the Judicial Conference of the United States, Subcommittee on Federal Death Penalty Cases,  Federal Death Penalty Cases: Recommendations Concerning the Cost And Quality of Defense Representation (May 1998)(adopted by the Judicial Conference of the United States on Sept. 15, 1998), at p. 10 of 39.

[28] *Id.*, at pp. 9-10 of 39 (emphasis in original).

The Report states the obvious: "Since an early decision not to seek death is the least costly way to resolve a potential capital charge, a prompt preliminary mitigation investigation leading to effective advocacy with the Justice Department is critical both to a defendant's interests and to sound fiscal management of public funds."[29] This Court has the obligation to establish a schedule that enables counsel to conduct a meaningful mitigation investigation prior to being compelled to make a mitigation presentation in this case.

### A THOROUGH DEFENSE MITIGATION INVESTIGATION PRIOR TO PARTICIPATION IN THE GOVERNMENT'S AUTHORIZATION PROCESS IS REQUIRED BY THE AMERICAN BAR ASSOCIATION GUIDELINES.

64.     The defense team is obligated to follow the Guidelines that have been set by the American Bar Association for representation in a capital case. *American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. February 2003)(published at 31 Hofstra L. Rev. 913 (2003))("*ABA Guidelines*"); *see also ABA Supplementary Guidelines for the Mitigation Function of the Defense Team in Death Penalty Cases*, 31 Hofstra L. Rev. 677 (2008)("*ABA Guidelines, Mitigation Function*").

65.     These Guidelines, most recently revised in 2003, are the result of an extensive and conscientious drafting and review process by experts in the field of death penalty litigation, including participation from, among others, the ABA Criminal Justice Section; ABA Section of Litigation; ABA Section on Individual Rights and

---

[29] *Id.*, at p. 21 of 39.

Responsibilities; ABA Standing Committee on Legal Aid and Indigent Defendants; ABA Special Committee on Death Penalty Representation; National Association of Criminal Defense Lawyers; National Legal Aid and Defender Association; Federal Death Penalty Resource Counsel; Habeas Assistance and Training Counsel; and State Capital Defenders Association. "The revised edition provides comprehensive, up-to-date guidance for professionals who work in this specialized and demanding field and helps to ensure effective assistance of counsel for all persons charged with or convicted of capital crimes." *Id.*, Introduction, para. 1 (31 Hofstra L.Rev. at 916).

66.     The Supreme Court and the Fifth Circuit have long relied upon these types of professional standards as a guide to determining what is reasonable in a criminal case. has stated that, for assessing whether counsel's representation satisfied the Sixth Amendment, *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (prevailing norms of practice as reflected in standards such as the ABA Standards for Criminal Justice are guides to determining what is reasonable.); *see also, e.g., Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (calling the ABA Criminal Justice Standards "valuable measures of the prevailing professional norms of effective representation"); *United States v. Shepherd*, 880 F.3d 734, 742 (5th Cir. 2018)(same; reversing conviction); *United States v. Juarez*, 672 F.3d 381, 390 (5th Cir. 2012)(same, reversing conviction).

67.     While the Guidelines do not exclusively define reasonableness, particularly for cases tried before they were adopted (see *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (guidelines adopted 18 years after trial)), federal courts routinely regard them as guides to what reasonableness means and to establish the prevailing professional norms at the time

of a defendant's trial. *Florida v. Nixon*, 543 U.S. 175, 191 (2004) (affirming in part because counsel's actions were consistent with the ABA Death Penalty Case Guidelines, and thus the lower courts did not err in denying relief to the habeas petitioner); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (relying on the 1989 version of the ABA Death Penalty Case Guidelines in reversing the denial of habeas corpus relief) (*quoting Strickland v. Washington, supra*); *United States v. Fields*, 761 F.3d 443, 456 (5th Cir. 2014) (denying relief, but measuring trial counsel's performance in part against what is required by the ABA Death Penalty Case Guidelines and accepting them as setting forth prevailing norms of practice); *Hoffman v. Cain*, 752 F.3d 430, 440 (5th Cir. 2014) (same); *Hoffman v. Cain*, No. CIV.A. 09-3041, 2012 WL 1088832, at \*8 (E.D. La. Mar. 30, 2012), *aff'd,* 752 F.3d 430 (5th Cir. 2014) (denying relief in part because the state court and the expert report both concluded that the 1989 ABA guidelines in effect at the time of trial had been followed).

68.     Courts reversing or vacating death sentences have often relied upon the ABA Death Penalty Case Guidelines.  *See Wiggins v. Smith*, 539 U.S. at 524 (noting that counsel's conduct "fell short" of "the guide[s] to determining what is reasonable" set forth in the Guidelines);  *Rompilla v. Beard*, 545 U.S. 374, 387 n. 7 (2005) (discussing the 1989 and 2003 versions of the ABA Death Penalty Case Guidelines and reversing the denial of habeas corpus relief); *Williams v. Stirling*, 914 F.3d 302, 315 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 105 (2019) (relying in part on the ABA Death Penalty Case Guidelines in affirming the grant of habeas corpus relief);  *Haliym v. Mitchell*, 492 F.3d 680, 716-17 (6th Cir. 2007) (relying in part on the ABA Death Penalty Case Guidelines in reversing the denial of habeas corpus relief);  *Earp v. Ornoski*, 431 F.3d 1158, 1185 (9th Cir. 2005)

(remanding for an evidentiary hearing on habeas petitioner's ineffective assistance of counsel claim because he has demonstrated a colorable claim that counsel's mitigation investigation was deficient); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (relying in part on the ABA Death Penalty Case Guidelines in granting habeas corpus relief); *Summerlin v. Schriro*, 427 F.3d 623, 638 (9th Cir. 2005) (ordering the grant of the writ of habeas corpus and noting that the ABA Guidelines require "extraordinary efforts" on behalf of the accused); *Yates v. Sinclair,* No. C13-0842 RSM, 2014 WL 499003, at *5 (W.D. Wash. Feb. 7, 2014) (unpublished) (granting petitioner's motion to stay and abbey federal habeas petition to permit exhaustion of state remedies; relying in part upon ABA Death Penalty Case Guidelines to find that his issues were not plainly without merit); *Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512, at *16 (D. Wyo. Nov. 20, 2014) (unpublished) (relying in part on the ABA Death Penalty Case Guidelines in granting habeas corpus relief), *aff'd sub nom. Eaton v. Pacheco*, 931 F.3d 1009 (10th Cir. 2019); *see id.* at *36 (granting habeas corpus relief and finding that lead counsel failed to ensure that members of the team were qualified and had sufficient skill for the demands of the case: "The responsibility for assembling and supervising the capital defense team falls squarely on the shoulders of lead counsel. He or she is responsible for selecting the investigator and mitigation specialist, as well as co-counsel, and allocating, directing and supervising the work of the entire team in accord with the ABA Guidelines and professional standards. [ABA Guideline, 10.4, p. 63]."); *United States v. Kreutzer*, 61 M.J. 293, 301-02 (C.A.A.F. 2005) (affirming vacation of court-martial/murder specification based in part on the ABA Death Penalty Case Guidelines).  *See also Williams v. Taylor*,

529 U.S. 362, 396 (2000) (relying in part upon the ABA's Criminal Justice Standards, the Defense Function, in finding ineffective assistance of counsel and granting habeas relief). Scores of other federal and state cases have granted relief to defendants based all or part upon the ABA Death Penalty Case Guidelines.

69.     As explained in depth in the Defense Status Report (Doc. 80) (incorporated herein by reference), the Guidelines and the Supplementary Mitigation Guidelines not only require a thorough socio-familial history investigation across multiple generations, they also dictate the manner in which that investigation is to take place. This work requires numerous in-person interviews and extensive record collection, and proper in-person assessments of any mental health or cognitive impairments. *Ibid*. It is a protracted process that requires in-person meetings between Mr. Crusius, his family members, and others.  As noted above, Mr. Crusius has submitted to this Court  a detailed Declaration of Elizabeth Vartkessian, Ph.D. (May 27, 2020)(ECF Doc. 80-1) that explains why a proper mitigation investigation must be conducted in-person. Reviewing that Declaration will assist this Court in understanding why during the COVID-19 pandemic crisis counsel have been unable to undertake and certainly have not been able to conclude the type of mitigation investigation this case demands prior to Mr. Crusius's mitigation submission to the Government.

## STATEMENT OF CONFERRAL

70.     The Government opposes this request.

WHEREFORE, because of the extraordinary impediments caused by the global pandemic, the defense asks this Court to set a schedule that will ensure effective assistance of counsel for Mr. Patrick Crusius by entering an order (1) that the schedule for Mr. Crusius's pre-authorization mitigation presentation to the Government outlined in Justice Manual, Title 9-10.080 et seq. and CJA Guidelines, v. 7, Part A, Chapter 6, § 670 will be discussed at the status conference schedule for October and (2) that the defense obligation to present mitigation evidence to the Government will be stayed until such time as investigation can resume and counsel can be constitutionally effective in making a mitigation presentation that will bear on the decision whether to seek the death penalty.

Mr. Crusius requests that, at the status conference scheduled for October, the Court determine the status of the pandemic and how it relates to the ability of the defense team to provide constitutionally adequate representation to Mr. Crusius and ascertain the outlook for a case schedule and for potential setting of a date for the defense submission to the local United States Attorney's office.

Respectfully submitted this 11th day of July, 2020.


KILLMER, LANE & NEWMAN, LLP
*/s/ David A. Lane*
David A. Lane

David A. Lane
Colorado Bar No. 16422
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
Telephone: 303-571-1000
Facsimile:  303-571-1001
Email: dlane@killmerlane.com

Rebecca L. Hudsmith
Louisiana Bar No. 07052
Office of the Federal Public Defender for
the Western and Middle Districts of La.
102 Versailles Boulevard, Suite 816
Lafayette, LA 70501
Tel: 337-262-6336 / Facsimile: 337-262-6605
Email: rebecca_hudsmith@fd.org

Cori Ann Harbour-Valdez
Texas Bar No. 24004685
The Harbour Law Firm, P.C.
1522 Montana Ave, 3rd Floor
El Paso, TX 79902
Tel: 915-544-7600
Facsimile: 915-975-8036
Email: cori@harbourlaw.net

Jane Fisher-Byrialsen
Colorado Bar No. 49133
Law Firm of Fisher & Byrialsen
4600 S. Syracuse Street, 9th Floor
Denver, CO 80237
Tel: 202-256-5664
Email: jane@fblaw.org


Kathleen McGuire
Colorado Bar No. 24686
The McGuire Law Office, LLC
P.O. Box 2008
Littleton, CO 80161
Tel: 303-921-9983
Facsimile: 720-306-7165
Email: kmcguire@kathleenmcguirelaw.com

Louis E. Lopez, Jr.
Texas Bar No. 00787923
Attorney at Law
416 N. Stanton Fourth Floor, Suite 400
El Paso, TX 79901
Tel: 915-543-9800
Facsimile: 915-543-9804
Email: llopez@lelopezlaw.com

**Attorneys for Mr. Patrick Crusius**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11th day of July 2020, I caused the foregoing *MOTION* and its *EXHIBIT(S)* to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

*/s/ Cori A. Harbour-Valdez*
Cori Harbour-Valdez