**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | § | |
| | § | |
| *Plaintiff*, | § | |
| **v.** | § | **EP-20-CR-00389-DCG** |
| | § | |
| **PATRICK WOOD CRUSIUS,** | § | |
| | § | |
| *Defendant*. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Presently before the Court is Defendant Patrick Wood Crusius's ("Defendant") "Motion to Set Schedule Ensuring Patrick Crusius Receives Effective Assistance of Counsel of Defense Counsel With Respect to the Question of Whether the Death Penalty Should be Sought" (ECF No. 85), filed on July 11, 2020. Therein, Defendant asks the Court to vacate the Government's currently scheduled pre-authorization mitigation presentation with defense counsel on July 30, 2020, and reset its scheduling until after the parties discuss a different date for it during the scheduled October 7, 2020 status conference. Mot. at 1, 4, ECF No. 85. For the reasons that follow, the Court **DENIES** Defendant's Motion.

## I.     BACKGROUND

Defendant stands accused of opening fire at a Walmart in El Paso, Texas, killing twenty-three people and seriously injuring many more. *See* Superseding Indictment, ECF No. 82. For these charges, Defendant is eligible for the death penalty. *See* 18 U.S.C. § 924(j)(1) (noting that a defendant is punishable by death when he, in the course of committing a crime of violence, causes the death of a person through the use of a firearm). If the Government believes that a sentence of death is justified, under the Federal Death Penalty Act ("FDPA"), it must timely file a notice of intent to pursue the death penalty against Defendant. *Id.* § 3593(a).

In determining whether death is justified, the Department of Justice ("DOJ") follows a series of policies and procedures in the Justice Manual commonly known as the "Death Penalty Protocol."  U.S. Dep't of Justice, Justice Manual §§ 9-10.000 *et seq.* [hereinafter, Justice Manual].  Under the Death Penalty Protocol, all death-eligible cases must go through a review process that provides defense counsel an opportunity to submit and present any mitigating evidence that would militate against a death sentence.  *Id.* §§ 9-10.030, 9-10.130.  "No final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence and argument in mitigation."  *Id.* § 9-10.130.

## II.    DISCUSSION

The Government here has scheduled the pre-authorization mitigation presentation with defense counsel on July 30, 2020.  Defendant argues that it is unreasonable to expect defense counsel to prepare and present a meaningful mitigation presentation by this date, especially given the sheer volume of evidence and complexity of the case coupled with the current exigent circumstances presented by the novel coronavirus ("COVID-19") pandemic.  Mot. at 7. Defendant further argues that, since the Court has the inherent authority to enter pretrial management orders to effectuate the speedy and orderly administration of justice —such as a scheduling order, then the Court also has the authority "to establish and manage a schedule of dates for resolution of whether the [G]overnment will seek the death penalty[.]"  *Id.* at 21.  Put plainly, Defendant contends that the Court has the power to reschedule the date of the pre-authorization mitigation presentation with defense counsel when it sees fit.

**A. The COVID-19 Pandemic Has Effectively Crippled the Mitigation Investigation.**

The Court agrees that this capital case is exceptionally voluminous and complex, and that postponing the July 30, 2020 mitigation presentation to afford the defense team additional time

to prepare a meaningful presentation because of the COVID-19 pandemic would not be unreasonable.  Barely a month after the Government indicted Defendant, on March 13, 2020, the President of the United States declared a national emergency in view of the COVID-19 outbreak. Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020).  That same day, the Governor of Texas similarly declared a state of disaster for the same reason.  *Governor Abbott Declares State of Disaster In Texas Due To COVID-*19, Office of the Texas Governor, Greg Abbott (Mar. 13, 2020), https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.  The Governor renewed this state of disaster on July 10, 2020, after an alarming increase in the number of people infected with the virus.  *Governor Greg Abbott Renews COVID-19 Disaster Declaration*, Office of the Texas Governor, Greg Abbott (July 10, 2020), https://gov.texas.gov/news/post/governor-greg-abbott-renews-covid-19-disaster-declaration.

The Chief Judge of the Western District of the Texas, the Honorable Orlando L. García, also entered an order that day virtually suspending all court operations, which substantially limited progress in most, if not all, criminal matters pending in this District, including Defendant's.  Chief Judge Orlando L. García, *Order Regarding Court Operations Under The Exigent Circumstances Created by the COVID-19 Pandemic*, United States District Court for the Western District of Texas (Mar. 13, 2020), https://www.txwd.uscourts.gov/wp-content/uploads/2020/03/Order-Re-COVID-19.pdf.  Since then, Chief Judge García's order has been supplemented six times; its effects on court operations persist up to this day with no immediate foreseeable end in the near future.[1]

---

[1] These supplemental orders are available online at: https://www.txwd.uscourts.gov/coronavirus-covid-19-guidance/.

Indeed, because of the exigent circumstances described in these ensuing orders, the Court has rescheduled this case's next status conference—in which the forthcoming scheduling order remains the most pressing issue to be addressed—three times already for several months in advance.  *See* ECF Nos. 55, 79, & 81.  Not surprisingly, as Defendant painstakingly expounded in his June 15, 2020 "Status Report" (ECF No. 80) and the instant motion, the COVID-19 pandemic, together with the ensuing national and state emergency declarations, local stay-at-home orders, and the Center for Disease Control ("CDC") Guidelines[2], have effectively crippled the defense counsel's mitigation investigation.

The importance of a meaningful mitigation investigation for the pre-authorization mitigation presentation cannot be understated.  The "Spencer Report"[3], prepared in 1998 by the Committee on Defender Services Subcommittee on Federal Death Penalty Cases for the Judicial Conference of the United States, notes that:

> Since an early decision not to seek death is the least costly way to resolve a potential capital charge*, a prompt preliminary mitigation investigation leading to effective advocacy with the local U.S. Attorney and with [DOJ] is critical both to a defendant's interests and to sound fiscal management of public funds.*  And, since the local prosecutor's recommendation most often prevails with the Attorney General, the opportunity to persuade the U.S. Attorney not to request capital authorization is extremely important.

Spencer Report at 93 (emphasis added).

---

[2] These guidelines are available online at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html.

[3] The Spencer Report examines "the cost, quality, and availability of defense representation" in federal capital cases and "presents information on the authorization, defense, and management of federal capital cases."  Hon. James R. Spencer, et al., Committee on Judicial Services of the Judicial Conference of the United States, Subcommittee on Federal Death Penalty Cases, Federal Death Penalty Cases: Recommendations Concerning the Cost And Quality of Defense Representation at 1–3 (May 1998) (adopted by the Judicial Conference of the United States on Sept. 15, 1998) [hereinafter, Spencer Report]. The report "provides useful information and recommendations to courts on conducting and managing capital cases."  *United States v. Esteves*, CR 17-201, 2018 WL 6817024, at *5 n.17 (E.D. La. Dec. 27, 2018).

Finding and interviewing witnesses who have known a capital defendant throughout his life is at the core of a mitigation investigation. The American Bar Association's ("ABA") "Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases" describes the importance of in-person witnesses in the following way:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

ABA, Mitigation Guideline 10.11(C), *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008). In-person interviews are also necessary not only for obtaining a witness' mitigating testimony, but also any potential mitigating physical evidence such as documents, photographs, or other records that a witness may possess. *See* Mitigation Guideline 10.4(A), *id.* at 688 ("It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy.").

But to date, the ensuing orders and CDC Guidelines still restrict nearly all non-essential travel and contact and interaction with other people in an attempt to stop the spread of the virus—substantially limiting the defense team's ability to travel and conduct in-person interviews. According to Defendant, some defense team members and certain potential mitigation witnesses are especially at risk of infection because they fit into the category of the population who is at high risk due to their age and existing medical conditions. Since most potential witnesses are located here in Texas, where deaths and hospitalizations continue to spike to this day, these witnesses will reasonably likely be afraid to welcome strangers (particularly

defense investigators) into their homes because of legitimate fears of COVID-19 transmission. To make matters worse, contacting potential witnesses solely though telephone would prove devastating to the defense team in trying to obtain any mitigating evidence from them. *See Eaton v. Wilson*, 09-CV-261-J, 2014 WL 6622512, at \*73, \*84 (D. Wyo. Nov. 20, 2014), *aff'd sub nom. Eaton v. Pacheco*, 931 F.3d 1009 (10th Cir. 2019) (describing the approach of contacting potential mitigation witnesses solely via telephone in a capital case as "a textbook for how not to do it" and concluding that the defense team "clearly did not adequately perform a thorough mitigation  investigation."). As such, the Court agrees with Defendant that attempting to conduct in-person interviews during these times would not only go against all ensuing federal and state orders and the advice of the national public health authorities, but also risk damaging any possible relationship between his defense team and potential mitigation witnesses.

**B. But the Court Lacks Authority to Vacate and Reschedule the Mitigation Presentation.**

That said, the Court nevertheless lacks the authority to grant Defendant the relief he seeks because the pre-authorization mitigation presentation is not a judicial proceeding presided over by a judge, but part of an "administrative, discretionary decision-making process of whether to seek the death penalty." *United States v. Shakir*, 113 F. Supp. 2d 1182, 1188 (M.D. Tenn. 2000); *see also United States v. Slone*, 969 F. Supp. 2d 830, 833 (E.D. Ky. 2013) (concluding that "courts lack the authority to schedule the defendant's presentation under the Death Penalty Protocol"); *United States v. Tsarnaev*, CRIM.A. 13-10200-GAO, 2013 WL 5701582, at \*2 (D. Mass. Oct. 18, 2013) (same); *United States v. Hardrick*, CRIM.A. 10-202, 2011 WL 2516340, at \*3 (E.D. La. June 22, 2011) (same).

Contrary to Defendant's argument, the Court also lacks the authority to review whether the Government's scheduling of the pre-authorization mitigation presentation, as an agency

action, affords Defendant a "reasonable opportunity" per the Death Penalty Protocol.  First,

Congress has enacted no statute dictating any specific restrictions or procedures on how the

Government should manage the procedures delineated in the Death Penalty Protocol, including

the pre-authorization mitigation presentation.  Nor has Congress enacted any statute providing

for judicial review of the same.  *Shakir*, 113 F. Supp. 2d at 1187.

Second, no judicial review of this "agency action" is available under the Administrative

Procedural Act ("APA").  "The APA establishes a basic presumption of judicial review for one

suffering legal wrong because of agency action."  *Dep't. of Homeland Sec. v. Regents of the U.

of Cal.*, 140 S. Ct. 1891, 1905 (2020) (internal quotations and citations omitted).  "[This]

presumption can be rebutted by a showing that the relevant statute 'preclude[s]' review, [5

U.S.C.] § 701(a)(1), or that the 'agency action is committed to agency discretion by law,' §

701(a)(2)."  *Id.*  The agency action at issue here—namely, the scheduling of the pre-

authorization mitigation investigation—falls within the latter exception because it is an action

"committed to agency discretion by law."  5 U.S.C. § 701(a)(2).

Although it invites input from defense counsel, the Death Penalty Protocol remains part

of DOJ internal policy that directs the exercise of prosecutorial discretion in capital cases.  *In re

United States*, 197 F.3d 310, 315 (8th Cir. 1999).  "[A]s an incident of the constitutional

separation of powers, . . . the courts are not to interfere with the free exercise of the discretionary

powers of the attorneys of the United States in their control over criminal prosecutions."  *United

States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).  Thus, "[t]he prosecutorial discretion to make

charging decisions has repeatedly and consistently been held to be presumptively unreviewable

by the courts."  *Nichols v. Reno*, 931 F. Supp. 748, 751 (D. Colo. 1996), *aff'd*, 124 F.3d 1376

(10th Cir. 1997) (citing *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)); *see also United States v.*

*Molina*, 530 F.3d 326, 332 (5th Cir. 2008) ("We allow the government discretion to decide which individuals to prosecute, which offenses to charge, and what measure of punishment to seek." (citations omitted)).  Hence, judicial review of the Government's management of the procedures delineated in the Death Penalty Protocol would constitute an improper intrusion into the Government's exercise of prosecutorial discretion in capital cases.

Even assuming that review is available, the Death Penalty Protocol provides no judicially enforceable rights to death-eligible defendants.  A federal agency, by a regulation within its authority to issue, may grant people subject to its authority "more legally enforceable rights than a statute or the Constitution gives them."  *Samirah v. Holder*, 627 F.3d 652, 664 (7th Cir. 2010) (Posner, J.) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265–68 (1954)). When such circumstances are true, the Supreme Court has held that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  But the Death Penalty Protocol does not create a protectable interest for death-eligible defendants; nor does it have the force and effect of law as other agency regulations promulgated through notice and comment or adjudication because it consists of merely internal directives that "furnish only general guidance for [DOJ] employees."  *See Dong Sik Kwon v. Immig. and Naturalization Serv.*, 646 F.2d 909, 918–19 (5th Cir. 1981) (*en banc*). Indeed, the Justice Manual itself makes it plain that it "provides internal DOJ guidance [and] . . . is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal."  Justice Manual § 1-1.200;  *United States v. Cooks*, 589 F.3d 173, 184 (5th Cir. 2009).  Most circuit courts around the country unanimously share this view.  *See, e.g.*, *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005) ("[DOJ] guidelines and policies do not create enforceable rights for criminal

defendants."); *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (same); *United States v. Blackley*, 167 F.3d 543, 548–49 (D.C. Cir. 1999) (same); *In re United States*, 197 F.3d at 315 (same); *United States v. Myers*, 123 F.3d 350, 356 (6th Cir. 1997) (same); *United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) (same); *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir. 1990) (same).

As such, for the reasons enumerated above, the Court also agrees with a majority of the courts that the Death Penalty Protocol's review process is not a "critical stage" of a criminal proceeding for Sixth Amendment purposes that affects a defendant's right to a fair trial.  *See, e.g.*, *Shakir*, 113 F. Supp. 2d at 1186–91 (distinguishing the death penalty authorization process as an "administrative, discretionary, decision-making process of whether to seek the death penalty" from a "judicial proceeding[], presided over by a judge," such as sentencing hearings and adult certification hearings, both of which are considered "critical stages" for Sixth Amendment purposes); *United States v. Furrow*, 125 F. Supp. 2d 1170, 1176–77 (C.D. Cal. 2000) (reasoning that the death penalty authorization process is not a "critical stage" for Sixth Amendment purposes because of its informal nature, a matter of prosecutorial discretion and not subject to judicial review, and not adversarial in nature in comparison to probable cause hearings, plea withdrawal hearings, and preliminary hearings); *United States v. Boyd*, 931 F. Supp. 698 (D.R.I. 1996) ("The DOJ capital penalty authorization procedure does not encompass a pretrial confrontation or hearing where 'counsel's absence might derogate from the accused's right to a fair trial.'" (quoting *United States v Wade*, 388 U.S. 218, 226 (1967)); *see also United States v. McVeigh*, 944 F. Supp. 1478, 1484 (D. Colo. 1996) ("The constitutional protections of the life and liberty of a defendant are provided by the sentencing hearing following trial of the charges in the indictment.  The issuance of these notices is essentially a prosecutor's charging

decision.").[4]  Therefore, the Court is of the view that Defendant's Sixth Amendment right to

effective assistance of counsel has no bearing at the pre-authorization mitigation presentation.

Accordingly, a judicial remedy from the Court is inappropriate.

To be sure, Defendant is correct that the Court "has inherent power to control the

disposition of the causes on its docket with economy of time and effort for itself, for counsel, and

for litigants."  *United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005) (quoting *Landis v. N.*

*Am. Co.*, 299 U.S. 248, 254 (1936);  *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1417 (5th Cir.

1995) ("The federal courts are vested with inherent power 'to manage their own affairs so as to

achieve the orderly and expeditious disposition of cases[,]' . . . includ[ing] the power of the court

to control its docket[.]" (footnote omitted).  But Defendant relies on the Criminal Justice Act

("CJA") Guidelines from the Judicial Conference of the United States[5] to broadly construe the

---

[4] Only two cases have held that the death penalty authorization process is a "critical stage" of a criminal proceeding for Sixth Amendment purposes—both written by the same district judge.  *See United States v. Peña-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999) (Fusté, J.) (holding that the death penalty certification hearings are a "critical stage" for Sixth Amendment purposes because it "involves the most fundamental of the rights, the right to life, and, therefore, the client, not the attorney, is the appropriate party to make strategic decisions"); *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003) (Fusté, J.) (citing approvingly of *Peña-Gonzalez*'s holding).  *But see United States v. Torres-Gomez*, 62 F. Supp. 2d 402, 405 (D.P.R. 1999) (finding that *Peña-Gonzalez* is mistaken because (1) its reliance on *Mempha v. Rhay*, 389 U.S. 128, 134 (1967) is misplaced as that case held that the sentencing stage is a "critical stage" of a criminal proceeding for Sixth Amendment purposes, not an administrative hearing; and (2) failed explain how the death certification hearing affected "substantial rights of a criminal accused" when the Death Penalty Protocol does not create any substantive or procedural rights and is a matter of prosecutorial discretion).

[5] "The Judicial Conference of the United States, established by Congress in 1922, 42 Stat. 838, is a conference of the chief judges of the judicial circuits and the Chief Justice of the United States."  *United States v. Hayman*, 342 U.S. 205, 215 n.19 (1952).  It is charged with

> promoting uniformity of management procedures and the expeditious conduct of court business, in part by a continuous study of the operation and effect of the general rules of practice and procedure, and recommending changes to promote simplicity in procedure, fairness in administration, the just determination of litigation, and the elimination of unjustifiable expense and delay.

*Mistretta v. United States*, 488 U.S. 361, 390 n.15 (1989) (quoting 28 U.S.C. § 331) (internal quotation marks omitted).

Court's power to also allow the Court to vacate and reschedule the pre-authorization mitigation presentation.  Mot. at 3–4; 7 Guide to Judiciary Policy, ch. VI, Scheduling of Federal Death Penalty Case Authorization to Control Costs § 670(a) ("[T]he court should establish a schedule for resolution of whether the government will seek the death penalty.").

First, the CJA Guidelines are not binding on the Court because the Judicial Conference, with rare exception, publishes only "suggestions and recommendations."  28 U.S.C. § 331; *Slone*, 969 F. Supp. 2d at 834 ("While entitled to 'respectful consideration,' [the Judicial Conference's] policy conclusions generally are not binding on courts." (quoting *Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010)); *Hamilton v. Accu-Tek*, 942 F. Supp. 136, 137 (E.D.N.Y. 1996) (same).  And second, just as the Death Penalty Protocol, the CJA Guidelines create "no enforceable rights because they were not adopted pursuant to an enabling statute authorizing the Judicial Conference to act with the force of law."  *Slone*, 969 F. Supp. 2d at 835.  But even when giving respectful consideration to their "suggestions and recommendations," 28 U.S.C. § 331, the Court believes that Defendant construes the language in the CJA Guidelines too broadly.  *Perry*, 558 U.S. at 193.

Specifically, Defendant's broad construction conflates the purpose and functions of Chapter VI of the CJA Guidelines with those of 18 U.S.C. § 3593(a).  The CJA Guidelines and the statute may interplay with one another, but their purpose and functions differ.  Section 3593(a) "protect[s] the accused from having to endure a trial for his life for which he was not on reasonable notice" by requiring courts to inquire into "the objective reasonableness between the issuance of the Death Notice and the trial itself."  *United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003).  On the other hand, Chapter VI of the CJA Guidelines recommends courts to establish reasonable deadlines and maintain oversight during the pre-authorization process to

-11-

increase the efficiency of the authorization process and maximize cost-savings.  Spencer Report

at 106.  In other words, while the statute impliedly *mandates* courts to schedule the

Government's deadline to file its Notice of Intent to seek death within "reasonable time before

the trial", 18 U.S.C. § 3593(a), Chapter VI of the CJA Guidelines merely *recommends* courts to

schedule this deadline at a date that sufficiently allows "meaningful pre-authorization advocacy

by counsel for the defendant."  Spencer Report at 106.

   Put into context, section 3593(a) grants courts the authority to schedule the deadline for

the Notice of Intent to achieve the statute's purpose, but Chapter VI of the CJA Guidelines only

recommends that this deadline should also sufficiently allow "meaningful pre-authorization

advocacy by counsel for the defendant" in pursuit of improving the efficiency of the

authorization process.  *See* Spencer Report at 93 ("Since an early decision not to seek death is the

least costly way to resolve a potential capital charge*,* a prompt preliminary mitigation

investigation leading to effective advocacy with the local U.S. Attorney and with [DOJ] is

critical both to a defendant's interests and to sound fiscal management of public funds.").

   Hence, the Court does not construe the CJA Guidelines to suggest that courts have the

authority to commandeer the scheduling of the pre-authorization mitigation presentation from the

Government.  Neither does any statute, including § 3593, grant courts the authority to do the

same.  Indeed, even assuming that Defendant's broad construction is correct insofar as the CJA

Guidelines suggest that courts have the authority to do so, why has Congress not enacted any

legislation implementing Chapter VI as binding law—especially when the Judicial Conference's

"proceedings, together with its recommendations for legislation, are submitted to Congress"?

*Hayman*, 342 U.S. at 215 n.19; *see also* 28 U.S.C. § 331 ("The Chief Justice shall submit to

Congress an annual report of the proceedings of the Judicial Conference and its recommendations for legislation.").

Accordingly, **IT IS ORDERED** that Defendant Patrick Wood Crusius's "Motion to Set Schedule Ensuring Patrick Crusius Receives Effective Assistance of Counsel of Defense Counsel With Respect to the Question of Whether the Death Penalty Should be Sought" (ECF No. 85), is **HEREBY DENIED.**

**So ORDERED and SIGNED this 28th day of July 2020.**

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**