

**YVONNE ROSALES**
DISTRICT ATTORNEY
34TH JUDICIAL DISTRICT
El Paso, Hudspeth and Culberson Counties

September 10, 2022

Re:   State of Texas v. Patrick Crusius

TO THE HONORABLE LADIES AND GENTLEMEN:

In light of the Constitutional 6th Amendment speedy trial issues involved in this case and since the State of Texas has already provided notice of intent to seek the death penalty, we have determined it was necessary to file the attached Motion to Recuse the Honorable Judge Sam Medrano to memorialize the severe retaliation we are receiving to prevent us from prosecuting this case.

At this point, there is even a conspiracy to have me removed from office after being duly elected, all because I refuse defense counsel Joe Spencer's demands that I remove the death penalty. Please note that Joe Spencer showed up to the July 1 "status hearing" and read a statement to the Court that was surreptitiously prepared, which was a clear attack on my person and my administration. I would note that he continuously and inappropriately kept representing that he knew and understood what the Honorable Judge David Guaderrama was thinking and his positions on the case. The introduction of statements without laying the foundation is Joe Spencer's inappropriate effort to pit the state case against the federal case in an attempt to delay both cases, since he has a staff of 16 people receiving taxpayer funds with no clear accountability. In other words, the financial interests of Joe Spencer and his legal team have a clear conflict with the defendant's ability to have his case heard pursuant to the 6th Amendment speedy trial issue.

The retaliation also includes Judge Medrano's appointment of Justin Underwood to in effect harass me and unlawfully issue subpoenas for me and other unrelated parties. Justin Underwood on August 17, 2022, called my staff and issued a series of threats that are potentially criminal in nature. In light of the bomb threats our office has previously received, I am forced to take every threat seriously.

We would very respectfully note that the State was the first to arrest and indict the defendant in this case, and the first to seek the death penalty, and Judge Medrano insists on having hearings without the presence of the defendant. In light of the extreme

political nature and recent focus of the case, I am considering asking for the assistance of the Attorney General of Texas in the prosecution and handling of this case. Finally, I would want all parties to know that my administration has always and will always continue to hold the Honorable Judge Guaderrama in the highest regards.

Sincerely,

Yvonne Rosales
34th Judicial District Attorney


CC:  The Honorable Judge David Guaderrama
      Attorney General Merrick Garland
      The Honorable Governor Greg Abbott
      U.S. Attorney Ashley Chapman Hoff
      United States Court of Appeal for the Fifth Circuit
      The Honorable Judge Stephen Ables
      Defense Counsel Joe Spencer

El Paso County - 409th District Court

Filed 9/9/2022 1:04 PM
NORMA FAVELA BARCELEAU
District Clerk
El Paso County
20200D02631

IN THE 409TH DISTRICT COURT
EL PASO COUNTY, TEXAS

| | |
|---|---|
| THE STATE OF TEXAS | |
| v. | CAUSE NO. 20200D02631 |
| PATRICK WOOD CRUSIUS | |

### STATE'S MOTION TO RECUSE
### THE HONORABLE JUDGE SAM MEDRANO

Comes now, Movant, the State of Texas, by the undersigned Assistant District Attorney for the 34th Judicial District, pursuant to rules 18a and 18b of the Texas Rules of Civil Procedure and files this, the State's motion to recuse the Honorable Sam Medrano, and would show the Honorable Court as follows:

### I.    APPLICABLE LAW

Rule 18b(b) of the Texas Rules of Civil Procedure provides that a judge must recuse himself in any proceeding in which " . . . the judge's impartiality might reasonably be questioned." *See* TEX. R. CIV. P. 18b(b)(1).  In determining whether recusal is required, "the proper inquiry is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial." *See Fuelberg v. State*, 410 S.W.3d 498, 509 (Tex.App.—Austin 2013, no pet.), *quoting Ex Parte Ellis*, 275 S.W.3d 109, 115-17 (Tex.App.—Austin 2008, no pet.);

1

*see also Kniatt v. State*, 239 S.W.3d 910, 915 (Tex.App.—Waco 2007, no pet.). The standard is an objective one that focuses not on the judge's subjective state of mind and beliefs about whether he can be fair and impartial, but instead asks whether a reasonable person would doubt that the judge could remain impartial under the circumstances. *See Fuelberg*, 410 S.W.3d at 509-10.

"Because this test requires courts to evaluate a motion to recuse from a disinterested observer's point of view, it seems best suited to achieve the primary purpose of Rule 18b(2)(a) [prior version of Rule 18b(b)(1)]: avoiding the appearance of judicial bias." *See Rogers v. Bradley*, 909 S.W.2d 872, 873 (Tex. 1995) (Enoch, J. responding to Gammage, J.'s "Declaration of Recusal").  As the Austin Court of Appeals has explained, ". . . recusal is concerned not only with actual personal or pecuniary interests, but also the appearance of impartiality when all factors are reviewed as a whole." *See Fuelberg,* 410 S.W.3d at 509, *citing Rogers*, 909 S.W.2d at 873 ("Declaration of Recusal by Gammage, J.) (noting that the issue is one of perception.)

## II.    BASIS OF KNOWLEDGE

The undersigned Assistant District Attorney is Senior Division Chief for the Office of the District Attorney for the 34th Judicial District of Texas.  The undersigned has been tasked with stating what is set out below based on his

personal knowledge and information and belief regarding the events related. Where his understanding of events is based on information and belief, the basis for that belief will be specifically stated parenthetically.

### III.   BACKGROUND

Defendant Patrick Crusius stands charged by indictment herein with one count of Capital Murder of Multiple Persons and 22 counts of Aggravated Assault with a Deadly Weapon, alleged to have occurred on or about August 3, 2019 in El Paso County, Texas.  All told, 23 people are alleged to have been killed in the capital murder count of the indictment. These allegations are commonly referred to as the "Walmart shooting."  The defendant was arraigned on these charges on October 10, 2019.

On or about November 7, 2019, before newly-elected District Attorney Yvonne Rosales had taken office, Judge Medrano held a hearing herein (which the undersigned watched via video as it occurred).  At that hearing it was presented to the Court that Assistant District Attorney John Briggs would be lead attorney for the State of Texas on this case.  Judge Medrano eventually stated that he would begin setting further hearings in this case shortly after the beginning of 2022.

At the beginning of 2021, Yvonne Rosales was sworn in as District Attorney for the 34th Judicial District of Texas.  Almost immediately, Judge Medrano

expressed dissatisfaction with Ms. Rosales' personnel assignments to his court. The personnel changes that accompanied the change of administration resulted in the assignment of a completely different set of prosecutors to the 409th District Court than had been assigned under the administration of the previous District Attorney. Judge Medrano was dissatisfied enough with these changes that he eventually requested and received a completely different set of prosecutors than had been assigned at first to his court by District Attorney Rosales. (The undersigned has personal knowledge of this via conversations with Judge Medrano. The tone of these conversations left the undersigned with the perception that Judge Medrano felt disrespected by District Attorney Rosales in regard to the assignment of prosecutors to his court.)

After District Attorney Rosales took office, Assistant District Attorney John Briggs was specifically tasked by the undersigned, via Mr. Briggs' direct supervisor, Division Chief Scott Ferguson, with spending "90% of his time" working on the two death penalty cases to which he was assigned, one of which was this case.

2021 was a pandemic year, and it was believed that work was proceeding apace on this case, particularly as no trials were being scheduled by the courts. (The undersigned's knowledge and belief as to this point is based on discussions

4

with Division Chief Ferguson related to Chief Ferguson's inquiries regarding the status of this case.)

The beginning of 2022 came and went, with no court settings whatsoever being scheduled herein by Judge Medrano. Assurances continued to be made by ADA Briggs that work was proceeding apace on this case. Given ADA Briggs' level of experience with murder and capital murder cases, it was believed that he was performing in accordance with his proven level of ability. (The undersigned's knowledge and belief is based on discussions with Division Chief Ferguson regarding Chief Ferguson's inquiries about this case.)

In May of 2022, District Attorney Rosales secured a grant from the office of Texas Governor Greg Abbott for $3 million in order that the expense of this case be borne by the State of Texas as a whole, rather than the County of El Paso alone. (The undersigned was involved in presenting this grant for approval by the County Commissioners of the County of El Paso, Texas.)

On or about June 24, 2022, the Honorable Judge David Guadarrama scheduled a trial date of January 8, 2024 in the federal criminal case against the defendant herein. As of that date, there had still been no hearings whatsoever scheduled by Judge Medrano in the state case since November 7, 2019.

On or about June 27, 2022, District Attorney Rosales, in a statement regarding scheduling, as opposed to any facts in the case, stated to certain media outlets that "we hope to have our case proceed to trial by the summer of 2023."

On June 28, 2022, this Court scheduled the first hearing to be held in this case since November 7, 2019. This new hearing was scheduled for July 1, 2022 at 11:00 am, and was styled as a "Status Hearing."

On July 1, 2022, Judge Medrano convened the "Status Hearing" at 11:00 am as scheduled. However, he had already filed an "Order Restraining Parties from Making Extrajudicial Statements (Gag Order)" ten minutes before the hearing commenced, as evidenced by the District Clerk's timestamp on the document. (A copy of this Order is attached hereto.) This early filing of the Order meant that neither the parties to the case, nor the extensive number of other individuals claimed to be subject to the Order, were offered any chance to be heard on any aspect related to it before the Order was entered into the record by the Court.

Another highly irregular deviation from standard practice in the course of this "Status Hearing" was that a large collection of local journalists were positioned, not only inside the courtroom, but actually in the jury box itself. It is a reasonable inference that this occurred with the permission of, if not at the invitation of, the Court, given that the Court controls access to the courtroom.

6

(The undersigned's basis for information and belief as to this hearing is a combination of a reading of the complete transcript of the hearing; a review of numerous media reports about the hearing, including the media's descriptions and characterizations of the tone and demeanor evidenced by Judge Medrano, as well as the camera angles of photographs taken during the hearing; and interviews conducted with witnesses to the hearing by the undersigned as a result of later directives by Judge Medrano to the undersigned for the collection of certain pieces of information sought by the court. The undersigned will note that, in the approximately 15 years that the undersigned has practiced criminal law in the District Courts of El Paso County. Texas, the undersigned has never once seen any member of the media be allowed to sit in the jury box during any hearing in any court.  However, it is known to have happened at this hearing.)

Once the "Status Hearing" was commenced, Judge Medrano immediately began to direct questions at District Attorney Rosales, who was seated at counsel table for the State.  These questions included an exploration at some length as to the level of readiness by the State in regard to any eventual trial of the case.  All of these questions were directed solely to District Attorney Rosales, even though Judge Medrano had known since November 7, 2019 that ADA John Briggs, who was seated next to DA Rosales at counsel table during the hearing, was assigned as

7

lead counsel for the State on the case and was therefore tasked with overseeing preparation of the case for trial.  Mr. Briggs was apparently asked no questions at all during the course of the hearing, nor did Mr. Briggs either assist in answering the questions, or volunteer any answer himself.  As Mr. Briggs had been in discussions with Judge Medrano in chambers within a few days prior to this hearing, along with the defense attorneys on this case, it is a reasonable deduction from the evidence that Judge Medrano could have asked him those questions and gotten an answer directly from the person who was charged with such knowledge. (The undersigned's basis for information and belief as to the questions asked is gleaned from the transcript of the hearing and from representations by John Briggs and others regarding the discussions.)

Additionally, it is of note that while the Court expressly stated, in an accusatory manner, that the State had apparently entered no filings into the record, no such filings were as yet required, given that the Court had failed to issue any scheduling order or filing deadlines whatsoever.

Other questions asked by Judge Medrano of DA Rosales included an exploration of her level of understanding of the amount of time involved in the individualized voir dire that is a factor under Texas law in any death penalty case. These questions were directed solely at her, even though Judge Medrano likely had

8

an awareness that DA Rosales had never worked on a death penalty case. Judge Medrano could easily have asked these questions of ADA Briggs, who he likely knew had capital murder case experience and who was seated directly next to DA Rosales. It is a reasonable inference from these events that Judge Medrano's intention was not to actually gather information, but was instead to embarrass DA Rosales in front of the members of the media who had been allowed to assemble in the jury box.

Judge Medrano further expressed concerns regarding the extent of media coverage generated by the parties and others exercising their First Amendment rights by communicating with the media regarding this case. These concerns were directed solely at DA Rosales, and were expressed in an emphatic fashion in front of the large collection of members of the media who had been allowed to situate themselves in the jury box. These concerns were expressed even though the Gag Order entered into the record before the hearing included a statement that "pre-trial publicity will interfere with the Defendant's right to a fair trial by an impartial jury." Since these concerns could have been expressed in chambers with the parties present but without the attendance of the media, it is a reasonable inference that the actual purpose of Judge Medrano was to generate media coverage rather than limit it. (The undersigned's basis for information and belief as to the tone and

9

demeanor of Judge Medrano arises from a review of numerous media reports of the hearing, as well as interviews by the undersigned with witnesses to the hearing itself. The judge's tone and demeanor is described in at least one media report as "clearly angry." Judge Medrano is also described as having "repeatedly criticized" DA Rosales. All of these media reports are a result of the decision by the Court to hold the hearing in front of the media assembled in the jury box. Furthermore, as is evidenced by previous and subsequent events, meetings in chambers between the Court and counsel, off the record and without media presence, have certainly occurred in the course of this case.)

Judge Medrano also queried DA Rosales regarding the grant secured from the Office of the Governor, primarily by making the statement that DA Rosales' decision to "hire out-of-town lawyers that will be prosecuting this case" was "the worst-kept secret in the legal community." This is not so much a request for information as it is a statement made in front of the assembled media. By the terms of its phrasing, it communicates ridicule of DA Rosales' decision-making in regard to personnel matters, combined with an insinuation that lawyers who are not from El Paso are somehow inappropriate for the handling of this case. This statement was directed at DA Rosales despite the fact that lead counsel for the defense, attorney Mark Stephens, is not from El Paso but instead resides in San

Antonio, Texas. (The undersigned's basis for information and belief as to these specific events comes from the transcript of the hearing, as well as a review of numerous media reports.)

DA Rosales was clearly at a disadvantage during this questioning, having had no warning of the subject matter of the "Status Hearing," including the fact that the title of the hearing was apparently designed to be obscure. The defense, on the contrary, apparently read from a carefully-prepared statement when given the chance to present remarks to the Court. (The undersigned's information and belief as to these events is based on a review of the media coverage, including the photos and videos related thereto.)

Judge Medrano then stated, "Never in my 26 years on the bench have I had to resort to the order that I have this morning entered in this case," despite the fact that the only claimed statement to the media was that the State HOPED to be ready for trial by the summer of 2023, which absolutely does not rise to the level of a statement designed to affect jurors in a case.

The hearing concluded with a statement by Judge Medrano that, "The grandstanding ends today." It is a reasonable inference that this statement was intended to be the last word to the media.

11

It is worthy of note that the previous District Attorney, Jaime Esparza, repeatedly made statements about this case to the media, statements which related various aspects of the facts of the case, without ever drawing the ire of Judge Medrano.

On September 12, 2019, Esparza confirmed to the El Paso Times that a family member was a victim and witness to the incident. He went on to comment on her mental anguish, that he did not believe his relation to his relative was a conflict of interest, and discussed mental health issues of the victims, that there might be a change of venue, and the potential cost to the community. (The undersigned's basis for information and belief is his memory of these statements combined with recent research.)

On October 26, 2019, Jaime Esparza gave an interview to local reporter Angel Kocherga about prosecuting the Walmart case and the impact on the community. (The undersigned's basis for information and belief is his memory of this interview combined with recent research.)

On February 25, 2020, Jaime Esparza gave an interview to the Texas Tribune and other members of the media, including television station KTSM. He stated he was not willing to transfer the case to the federal government, that funding should not be a "barrier," and that he was willing to prosecute the case.

He stated, "If you're going to take 22 lives from us, plus the 26 that you injured and all the people that you've hurt . . . El Paso is up to the task." (The undersigned's basis for information and belief is his memory of these statements combined with recent research.)

Judge Medrano did not find any of these statements to the press worthy of any action whatsoever, much less the issuance of a gag order, even though they are far more extensive than any statement ever made to the press by District Attorney Rosales.

Subsequent to the July 1st "Status Hearing," on August 3, 2022, attorney Amanda Enriquez, who had previously been assigned as a prosecutor on the Walmart shooting case under the administration of the previous District Attorney, gave an interview to the media in which she expressed opinions about the case. The Court thereafter evidenced no concern about this interview in relation to the Gag Order. (The undersigned watched excerpts from this interview on television news.)

On August 4, 2022, multiple local media outlets received an email originating from an email account linked to Rosa Maria Valdez, mother of the biological children of Walmart shooting victim Alexander Hoffmann. This email expressed concerns that Amanda Enriquez, who had been identified by the media

as a potential candidate for District Attorney in the next election cycle, was using

the Walmart shooting case for political purposes.  The email represented that it had

been written by Alexander Hoffmann Valdez, one of Alexander Hoffmann's

children.  (The undersigned knows of only certain parts of the contents of this

email, from reporting by local media.)

On August 12, 2022, the Court scheduled another "Status Hearing."  This

hearing was scheduled for August 18, 2022.  In preparation for that day, the

attorneys for the parties, including the undersigned, were summoned to an off-the-

record meeting with the Court in the court's chambers.  At this meeting, the State

was verbally ordered to provide the Court with certain information related to

events following the "Status Hearing" on July 1, 2022.  This information

effectively constituted the beginning of an investigation.  Specifically, among other

things, the State was ordered to identify who, if anyone, had spoken to the victims

and the families of the deceased after the hearing on July 1, 2022, as well as the

names of Victims Assistance personnel who had accompanied the victims and

families of the deceased at the July 1 hearing.  The State was also asked by the

Court to contact the Hoffmann family and request their attendance at the hearing

scheduled for August 18, 2022.  The Court expressed an interest in simply making

certain that the Hoffmanns clearly understood the terms of the Gag Order.

14

The State in fact complied with the order to provide information, at first verbally while in chambers during the off-the-record meeting, and then in writing the following day, following an admonishment via email from the Court for a failure to timely comply with the Court's verbal, unrecorded order to provide the information in writing.

Before the August 18th "Status Hearing" took place, however, the Court again held a meeting with counsel for the parties, off-the-record and in chambers. At this meeting the State informed the Court that it had so far been unsuccessful in making contact with the Hoffman family. The Court then decided that it would instead appoint counsel to represent the Hoffmann family, with a reference being made to the potential danger that one of them might somehow incriminate themselves in regard to the Gag Order. This concern seemed strange to the undersigned in light of the Court's previously expressed intention to simply make certain that the Hoffmanns understood the precise terms of the Gag Order.

The State agreed to file a motion for continuance of the August 18 hearing, on grounds that it had so far been unable to make contact with the Hoffmann family. This motion was filed by the undersigned on August 17, 2022, and was granted on that date by the Court.

15

On that same day, Justin Underwood, attorney at law, was sua sponte appointed by the Court to represent the Hoffman family "in any future proceeding that may arise in this cause." Justin Underwood is a known critic of Yvonne Rosales, who has made statements hostile to her administration previous to this appointment. The Court neither solicited nor accepted any input as to the choice of attorney from either of the parties, going so far as to state that he would not accept input from the parties. Mr. Underwood's appointment was entirely of the Court's own choosing.

Subsequently, attorney Underwood contacted the undersigned by telephone and requested contact information from the State's files for the Hoffmann family. He stated that his only intention was to "protect" the Hoffmann family to the best of his ability, and that he was confident that the entire episode would turn out to be a "learning experience" for all involved. These statements seemed innocuous enough at that time to the undersigned, who agreed to provide the contact information as a courtesy, despite not having been ordered to do so by the Court.

However, on that same afternoon, before the contact information could be provided, attorney Underwood also contacted Division Chief Scott Ferguson by telephone. The tone of this conversation was decidedly different. Mr. Underwood emphatically indicated to Chief Ferguson (who was his old friend and trial partner

16

from Underwood's tenure at the District Attorney's Office years before) that he suspected that the email had been written, not by the Hoffmanns, but by one or more other people, and that he intended to investigate that.  It is unquestionable that such an investigation would be outside the scope of the appointment according to the order appointing Mr. Underwood.  Regardless, the fact that Judge Medrano subsequently scheduled a further hearing, apparently to facilitate such an extrajudicial investigation, demonstrates Judge Medrano's bias in this case.  (The undersigned's information and belief for these events is based in conversations with Chief Ferguson.)

Given the emphatic nature of Mr. Underwood's communication with Chief Ferguson, any thought of providing the Hoffmann's contact information as a courtesy was discontinued, since it was unclear in what manner Mr. Underwood might choose to engage the Hoffmanns, and since it was beginning to appear that Mr. Underwood might have different motivations in regard to the Court's appointment beyond simply representing the best interests Hoffmann family.  (It should be noted that the Court has to date still never ordered the State to provide any information to Mr. Underwood.)

On August 23, 2022, the Court and the Office of the District Attorney both received an email from Jose Morales, stating that his law firm in Mexico represents

the Hoffmann family, and that they rejected the representation of Mr. Underwood. (A copy of this email is attached to the State's Motion to Quash Mr. Underwood's subsequent subpoenas, and a copy of that Motion is attached hereto.)

Despite the fact that there was now a question regarding the status of Mr. Underwood's representation and his ability to ethically continue to represent clients who had purportedly rejected his representation, the Court took no action.

Subsequently, Mr. Underwood was observed communicating with a local journalist on social media, advocating for the filing of a Petition to remove DA Rosales. He thereafter was heard being interviewed on radio station KLAQ, advocating for an end to Ms. Rosales' tenure in office as District Attorney. It was known to the undersigned that Mr. Underwood was distressed by the fact that a decrease in case filings by the District Attorney's Office had negatively impacted his income by decreasing the number of new clients seeking legal representation. (The basis of the undersigned's information and belief regarding these events is a combination of personal knowledge from previous conversations with Mr. Underwood, along with conversations with witnesses to the events.)

Despite these occurrences, most of which appear to have taken place in public view, the Court took no action until August 30, 2022.

On August 30, 2022, the Court scheduled yet another "Status Hearing." This hearing was scheduled for September 13, 2022. The purpose of the hearing is undiscernible from the title of the hearing.

Subsequently, on September 6, 2022, Mr. Underwood caused to be issued three subpoenas for the hearing on September 13. The persons subpoenaed are District Attorney Yvonne Rosales, Judge Roger Rodriguez, and former ADA John Briggs. Mr. Underwood sought and received issuance of these subpoenas despite lacking any legitimate legal standing or basis to do so in this criminal case, given that he is not the defendant, an attorney for the defendant, or an attorney for the State herein. (The full substance of the State's objections to these subpoenas is memorialized in the State's Motion to Quash, a copy of which is attached hereto.)

Despite the absolute lack of any lawful standing on Mr. Underwood's part to effect the issuance of subpoenas in this case, the subpoenas have in fact been issued, service of those subpoenas is being pursued, and the Court continues to take no action.

The State now files this Motion to Recuse the Honorable Sam Medrano.

## IV.   ARGUMENT

The sequence of the aforesaid events demonstrates that it is a reasonable inference that Judge Medrano developed a personal animus against DA Rosales at

some point in time prior to the present, perhaps as early as near the beginning of her current term in office.  It is also a reasonable inference that he subsequently felt provoked by her innocuous statement (made via the exercise of her First Amendment right to free speech) that she "hoped" this case would go to trial in the summer of 2023.  It is furthermore a reasonable inference that Judge Medrano then proceeded to devise methods by which he sought to impugn her in the public's perception.

The Gag Order is a case in point.  In entering the gag order ten minutes before the hearing, without taking any input from or allowing any objections by the parties, Judge Medrano blatantly disregarded the law.

*Davenport v. Garcia, 843 S.W.2d 4 (Tex. 1992)* sets out the current law regarding gag orders.  *Davenport* explains that the Texas Constitution gives greater protection for the freedom of speech than does the U.S. Constitution.  The Supreme Court went on to explain, setting the standard:

> Since the dimensions of our constitutionally guaranteed liberties are continually evolving, today we build on our prior decisions by affirming that a prior restraint on expression is presumptively unconstitutional. With this concept in mind, we adopt the following test: a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action

20

represents the least restrictive means to prevent that harm.

*Davenport* has been held to apply to criminal cases as well as to civil cases.

*In Re Graves,* 217 S.W.3d 744 *(Tex.App.–Waco  2007); San Antonio Express–*

*News v. Roman,* 861 S.W.2d 265, 267–68 (Tex.App.-San Antonio 1993).

Under *Davenport,* the judge must make "specific findings supported by

evidence." *Davenport,* 834 S.W.2d at 10; *Marketshare Telecom,* 198 S.W.3d at

917; *accord Grigsby v. Coker,* 904 S.W.2d 619, 620 (Tex.1995) (orig.proceeding)

(per curiam); *Tex. Mut. Ins. Co.,* 156 S.W.3d at 129; *Brammer,* 114 S.W.3d at 107.

In *Davenport,* the court set out the deficiencies which were found in that gag order:

> The orders fail to identify any miscommunication that the
> trial court may have perceived, does not indicate any
> specific, imminent harm to the litigation, and offers no
> explanation of why such harm could not be sufficiently
> cured by remedial action. For instance, had any
> miscommunication stemmed from improper statements
> by Relator, as implied by the court, the proper response
> may have been to sanction her conduct.  By stopping not
> only the purported miscommunications
> but *any* communications, the broadly worded injunction
> certainly fails the second part of our test.

*Davenport,* 834 S.W.2d at 11.

The Trial court in *Graves* found similar failings in the gag order that the

court therein was addressing.  "In similar fashion, Respondent failed to make

'specific findings' detailing the nature or extent of the pretrial publicity in Graves's

21

case or how the pretrial publicity or the record from his prior prosecution will impact the right to a fair and impartial jury." *GravesI,* Supra,, at *762-753, Also, See Grigsby,* 904 S.W.2d at 620; *Davenport,* 834 S.W.2d at 11; *Marketshare Telecom,* 198 S.W.3d at 918; *Markel v. World Flight, Inc.,* 938 S.W.2d 74, 79–80 (Tex.App.-San Antonio 1996, no writ); *Low v. King,* 867 S.W.2d 141, 142 (Tex.App.-Beaumont 1993, orig. proceeding); *San Antonio Express–News,* 861 S.W.2d at 268; *cf. Houston Chronicle Publ'g Co.,* 64 S.W.3d at 108.

In the above-captioned action, Judge Medrano entered the Gag Order ten minutes before the July 1, 2022 hearing even began.  No evidence was taken regarding pre-trial publicity prior to the entry of the Gag Order, nor was there any evidence presented at the hearing itself.  No finding based on adduced evidence established that there had been any actual miscommunication, nor was there shown any actual harm that occurred.  And there was no hearing regarding less restrictive means of addressing any harmful pre-trial publicity.

Instead, Judge Medrano recited in his Gag Order that "The Court takes judicial notice of: 1) the unusually emotional nature of the issues involved in this case; 2) the extensive local and national media coverage this case has already generated; and 3) the various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media."

22

A trial court has the discretion to take judicial notice of adjudicative

facts *sua sponte. See* TEX.R. EVID. 201(c). However, "[a] party is entitled upon

timely request to an opportunity to be heard as to the propriety of taking judicial

notice and the tenor of the matter noticed. In the absence of prior notification, the

request may be made after judicial notice has been taken." *Id.* 201(e).

A judicially-noticed fact must be one not subject to reasonable dispute in

that it is either (1) generally known within the territorial jurisdiction of the trial

court or (2) capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned. TEX.R.EVID. 201(b). Judicial notice

is an exception to the normal requirement of proof, which must be justified by a

"high degree of indisputability." *Garza v. State,* 996 S.W.2d 276, 279–80

(Tex.App.-Dallas 1999, pet. ref'd).

Judicial notice of pretrial publicity may occasionally be appropriate. *In re

Houston Chronicle Publ'g Co.,* 64 S.W.3d 103, 105 (Tex.App.-Houston [14th

Dist.] 2001). However, that is not the case when the parties are not given the

opportunity to be heard or to present evidence to the contrary. *Graves, Supra.*

There was, in this case, of course no opportunity for any party to be heard or

any objection to be made prior to Judge Medrano taking such judicial notice, nor

prior to his making findings thereon, because the Gag Order had already been

issued before the hearing even began.

Certainly, the "various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media" are not facts that are not subject to reasonable dispute in that they are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Indeed, without a hearing in which evidence could be presented, there was not even a statement or finding regarding whether any of the parties had given interviews, nor how many had been given nor whether any statements of the parties regarding the facts of the case were actually made or reported on.

In *Graves, supra*, at 752-753, the court held, as the basis for its ultimate holding that the gag order in that case was improper, "Respondent failed to make 'specific findings' detailing the nature or extent of the pretrial publicity in Graves's case or how the pretrial publicity or the record from his prior prosecution will impact the right to a fair and impartial jury." Likewise, in this case, Judge Medrano failed to make specific findings detailing the nature or extent of the pretrial publicity, or how pretrial publicity would impact the right to a fair and impartial jury.

Instead, the Court made a finding that "Counsels' willingness to give interviews to the media would only serve to increase the volume of pre-trial publicity." Yet there is no finding that any counsel had given interviews to the media. No evidence was produced that any party had actually given interviews to the media, nor was the State allowed to produce evidence that the one extrajudicial statement which apparently gave rise to this finding by the Court was not an interview, but rather was a simple statement that the Stated hoped the case could begin trial by the summer of 2023.

The next finding by the Court was that "if Counsel for the parties continue to grant interviews to the media, the pre-trial publicity will interfere with the Defendant's right to a fair trial by an impartial jury." Even if those facts of which judicial notice was taken by the Court were properly taken notice of, there was certainly no evidence of how that pre-trial publicity might interfere with the Defendant's right to a fair trial by an impartial jury.

The court further entered a finding that "no less restrictive alternative means exist to treat the specific threat to the judicial process generated by this pre-trial publicity," without taking any evidence regarding less-restrictive alternative means; nor were any of the parties to be bound by said order allowed to present any evidence to the court.

Finally, the Court found that "an Order restricting extra-judicial commentary by Counsel for the parties is necessary to preserve all venue options and a delay in proceedings would not lessen the publicity generated by this case." Once again, there was no evidence regarding the need to preserve all venue options or why this order would actually be necessary to do so. And there was no evidence regarding how a delay in proceedings would not lessen the publicity generated by this case.

There is little question that Judge Medrano is a knowledgeable and erudite jurist, who must have been aware of these points of law. Therefore, the clear deficiencies in the procedure and substance of the Gag Order demonstrate a reasonable inference that its purpose was not as stated, but rather was that it be used as a tool to impugn DA Rosales instead.

Furthermore, Judge Medrano's statements as he was berating DA Rosales demonstrate a reasonable inference that his motivations were to embarrass and demean her, rather than to actually address any pre-trial publicity that may have occurred.

It should further be noted that the only hearings scheduled in this case since November 7, 2019 have all been focused on the Gag Order and possible violations of the Gag Order. The subpoenas unlawfully issued by Mr. Underwood for the

"Status Hearing" currently scheduled for September 13, 2022 demonstrate that this hearing also is intended to have such a focus.

The triggering event for this motion was the unlawful issuance of subpoenas by Mr. Underwood on September 6, 2022, and therefore this motion is timely. (That event itself occurred less than 10 days before the next scheduled hearing in this case, so that limitation should not apply, and this motion is being filed as soon as practicable after the triggering event, given the length of the motion and the time involved in drafting it.)  By sua sponte choosing and appointing Mr. Underwood (who, rather than simply representing his appointed clients when and as the need arose, instead proceeded to institute an extrajudicial investigation, and who continued with that investigation even after his representation was apparently rejected by the appointed clients), Judge Medrano himself set in motion that extrajudicial investigation.  And since this investigation is being pursued by an attorney who has publicly expressed support for the removal from office of DA Rosales, it creates a reasonable inference that it has no purpose other than facilitating such a design.  Therefore, any reasonable person would doubt that Judge Medrano could remain impartial under such circumstances. *See Fuelberg*, 410 S.W.3d at 509-10.

The State is requesting a hearing on its motion pursuant to rule 18a(g)(6).

## V. PRAYER

Wherefore, the State prays that the Honorable Judge Sam Medrano recuse himself from this case, or, in the alternative, that the foregoing motion be referred to the Presiding Judge of the Sixth Administrative Judicial Region pursuant to the Texas Rules of Civil Procedure, that the State's motion to recuse the Honorable Judge Sam Medrano from any and all further proceedings in this matter be granted, and that the State receive any and all relief to which it may be entitled.

Respectfully submitted,

/s/ Curtis Cox
**CURTIS COX**
Assistant District Attorney
State Bar No. 24047797
500 E. San Antonio Ave., Suite 201
El Paso, Texas 79901
Phone: (915) 546-2059
Fax: (915) 533-5520
ccox@epcounty.com

## <u>AFFIDAVIT</u>

I, Curtis Cox, Assistant District Attorney for the 34th Judicial District, State of Texas, the movant, in the above-styled cause, attest under oath that, based upon my personal knowledge, as well as information and belief, the foregoing allegations in the State's Motion to Recuse the Honorable Judge Sam Medrano are

28

true and correct.

_____
Curtis Cox

SIGNED under oath before me on September 9, 2022.



_____
NOTARY PUBLIC, State of Texas

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was e-filed and served on Mark Stevens (mark@markstevenslaw.com), Joe Spencer (Joe@joespencerlaw.com), and Felix Valenzuela (felix@valenzuela-law.com), attorneys for Defendant, on September 9, 2022.

/s/ Curtis Cox
CURTIS COX
Assistant District Attorney

29

FILED
NORMA FAVELA BARCELEAU

# IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS
## 409TH   JUDICIAL DISTRICT 2022 JUL -1  AM 10: 50

EL PASO COUNTY, TEXAS

BY _____
DEPUTY

THE STATE OF TEXAS

vs.                                    CAUSE NO.      20200D02631

PATRICK WOOD CRUSIUS


### Order Restraining Parties from Making Extrajudicial Statements
### (Gag Order)


This Court has a duty to preserve the Defendant's right to a fair trial by an impartial jury and, if possible, to ensure that potential jurors will not be prejudiced by pretrial publicity. The Court is also mindful of the First Amendment rights of the parties, Counsel for the parties, the media, as well as the Open Courts Provision of the Texas Constitution. In efforts to balance these sometimes competing interests, Courts have found that prior restraint may be imposed only in extraordinary circumstances, and only if there is the threat of imminent, severe harm. Accordingly, before issuing a Gag Order, a Court must find that extensive media coverage will harm the judicial process.

This Court takes judicial notice of:

1) the unusually emotional nature of the issues involved in this case;
2) the extensive local and national media coverage this case has already generated; and
3) the various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media.

The Court FINDS that Counsels' willingness to give interviews to the media would only serve to increase the volume of pre-trial publicity.

The Court FURTHER FINDS that if Counsel for the parties continue to grant interviews to the media, the pre-trial publicity will interfere with the Defendant's right to a fair trial by an impartial jury.

The Court FURTHER FINDS that no less restrictive alternative means exists to treat the specific threat to the judicial process generated by this pre-trial publicity.

The Court FURTHER FINDS that an Order restricting extra-judicial commentary by Counsel for the parties is necessary to preserve all venue options and a delay in proceedings would not lessen the publicity generated by this case.

Accordingly, in its sound discretion and in light of the relevant facts and circumstances of this particular case, the Court ORDERS, ADJUDGES and DECREES that prior to and during the trial of this case:

1. All attorneys involved in this case shall strictly adhere to the letter and spirit of the provisions of the Texas Code of Professional Responsibility governing comments to the media. Specifically, all attorneys shall refrain from making "extrajudicial statements that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.07.

2. All attorneys, their staffs, and law enforcement officers involved in this case shall not discuss this case with the media.

3. Witnesses shall not discuss this case with the media when they have *previously* given statements:
    a. to law enforcement personnel,
    b. to representatives of the District Attorney's Office; or
    c. who have testified in investigative or adjudicative proceedings.

4. Witnesses who give statements to law enforcement personnel, representatives of the District Attorney's Office, or who testify in investigative or adjudicative proceedings *after the date of entry* of this order shall not discuss this case with the media.

5. This Order shall not be interpreted to prohibit attorneys from communicating with the parties in order to prepare for trial, nor shall it be interpreted to prohibit the third parties from attending any live sessions before the Court or from publishing any information they have already obtained or may obtain in the future. The term "third parties" includes any person or organization, not a party, not an

attorney for a party, or not a person employed by the parties or attorneys for the parties for the purpose of assisting in this litigation.

**Nothing in this Order is intended to prevent any person from stating the following:**

A factual statement of the Defendant's name or names, age or residence.

The time and place of the arrest, the identity of the arresting and investigating officers and agencies and the length of the investigation.

The text of the charges, including a brief description of the offense(s) charged.

Exact quotations from or reference to, without comment, any evidence given to the trial jury in this cause.

The scheduling and result of any stage of the judicial proceeding held in open court before the jury or in a public session.

Nothing in this Order is intended to prevent the Defendant or his attorneys from asserting his innocence.

This Order shall be in force during the pendency of the indictment in the above entitled and numbered cause, the trial of said cause, and the discharge of the trial jurors from further service in this cause.

**SIGNED this the 1st day of July, 2022.**

JUDGE SAM MEDRANO, JR.
409TH DISTRICT COURT

1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME

1

TRIAL COURT CAUSE NO. 20200D02631

2

3

4    THE STATE OF TEXAS                )    IN THE DISTRICT COURT

5                                      )

6                                      )

7                                      )

8    vs.                               )

9                                      )    EL PASO COUNTY, TEXAS

10                                     )

11                                     )

12   PATRICK WOOD CRUSIUS              )

13                                     )

14                                     )    409TH JUDICIAL DISTRICT

15

16        ---------------------------------------

17                          STATUS HEARING

18        ---------------------------------------

19        On the 1st day of July, 2022, the following

20   proceedings came on to be heard in the above-entitled

21   and numbered cause before the Honorable SAM MEDRANO,

22   JR., Judge presiding, held in El Paso, El Paso County,

23   Texas:

24        Proceedings reported by machine shorthand utilizing

25   computer-assisted realtime transcription.

```
 1                      A P P E A R A N C E S

 2

 3    YVONNE NICOLETTE ROSALES
      SBOT 24029805
 4    34th Judicial District Attorney's Office
      500 East San Antonio, Room 201
 5    El Paso, Texas  79901
      (915) 546-2059
 6

 7    ATTORNEY FOR THE STATE OF TEXAS

 8

      MARK STEVENS
 9    SBOT 19184200
      Law Office of Mark Stevens
10    310 South Saint Mary's Street, Suite 1920
      San Antonio, Texas 78205-3154
11    (210) 226-1433

12    JOE AURELIANO SPENCER, JR.
      SBOT 18921800
13    Joe A. Spencer Attorney & Counselor at Law
      1009 Montana Avenue
14    El Paso, Texas 79902-5411
      (915)532-5562
15
      FELIX VALENZUELA
16    SBOT 24076745
      Valenzuela Law Firm
17    PO Box 26186
      El Paso, Texas 79926-6186
18    (915)209-2719

19    ATTORNEYS FOR DEFENDANT

20

21

22

23

24

25
```

3

**CHRONOLOGICAL INDEX**
Status Hearing

JUNE 1, 2022                                    <u>PAGE</u>        <u>VOL</u>

Proceedings called to order..................4          1

The Court addresses Ms. Rosales..............4          1

Response by Ms. Rosales......................4          1

Response by Mr. Spencer.....................10          1

Proceedings concluded.......................18          1

Court Reporter's Certificate................19          1

1                    (Open court, defendant not present)

2                    THE COURT:  We are on the record in cause

3    number 20200D02631, The State of Texas versus

4    Patrick Wood Crusius.  The Court has convened the

5    lawyers in this case.

6                    Last week Federal District Judge

7    David Guaderrama scheduled the federal Crusius case for

8    a trial January 2024.  This week the district attorney,

9    Yvonne Rosales, issued a statement through the media

10   declaring when she wants to try this case.  And I

11   believe it was the summer of 2023, approximately, six

12   months prior to the beginning of Judge Guaderrama's

13   trial.

14                    Ms. Rosales, why did you do this?

15                    MS. ROSALES:  Your Honor, with all due

16   respect, I was asked when we would have this case set

17   for trial.  I said, "The district attorney does not have

18   any power to set settings," and we would be requesting

19   and approaching the Court along with opposing counsel to

20   request a scheduling order to discuss this case.  That

21   is what was said to the media.

22                    THE COURT:  Do you believe that's what it

23   looked like?

24                    MS. ROSALES:  I don't know what the media

25   put out, Your Honor.  All I know is that I was asked

1   when the case was going to go to trial on the State side

2   and I did clearly inform them that we were going to be

3   approaching the Court along with opposing counsel to

4   request a court date.

5            THE COURT:  They put out your press

6   release that said nothing about approaching this Court.

7   I've read your press release.  It said you want this

8   case to go in the summer of 2023.

9            MS. ROSALES:  Our goal was to have this

10  case scheduled before since we are seeking the death

11  penalty and the federal court is not seeking the death

12  penalty at this point in time.

13           THE COURT:  You previously sent out a

14  statement through the media when asked when this case

15  was going and you indicated that you do not set this

16  court's docket, but you invited the media to ask me

17  about it.  And you did that also in another case

18  recently where you indicated, "Please ask questions of

19  the court if you have any questions."  Are you of the

20  opinion that courts are allowed to comment on pending

21  matters before them?

22           MS. ROSALES:  No, Your Honor.

23           THE COURT:  So why have you done it on at

24  least two occasions to include this case?

25           MS. ROSALES:  What was informed to the

1    media was that we do not set the trial schedules.  If

2    there is anything pending, then they would have to

3    contact the court for scheduling.

4              THE COURT:  In the fall of 2021, you once

5    again went through the media and indicated that your

6    office was ready to prosecute this case as soon as it

7    was feasible to bring in a large enough panel and not be

8    concerned about the Coronavirus and that this case could

9    be tried in two weeks.

10             MS. ROSALES:  I would never indicate this

11   case could be handled in two weeks, Your Honor.

12             THE COURT:  The media misspoke about what

13   you said?

14             MS. ROSALES:  It would appear so.

15             THE COURT:  Okay.  How long -- if we began

16   the trial of this case in the summer of 2023 -- do you

17   anticipate this case taking to be tried?

18             MS. ROSALES:  We anticipate that it would

19   take at least two to three months to actually sit down

20   and -- or for the presentation of evidence.

21             THE COURT:  Getting to --

22             MS. ROSALES:  Prior to that, we would also

23   need at least 60 days to go through individual voir

24   dire.

25             THE COURT:  You think individual voir dire

1  can take -- be done in two months?

2                    MS. ROSALES:  Yes, sir.

3                    THE COURT:  So that if this did happen

4  before Judge Guaderrama's scheduled jury trial, the

5  defense lawyers would have at least three months to

6  prepare for that?

7                    MS. ROSALES:  Absolutely, Your Honor.

8                    THE COURT:  The accused is not here.  The

9  Court did waive his appearance because he is in the

10 county jail under federal custody.

11                   Are you aware of that?

12                   MS. ROSALES:  Yes, sir.

13                   THE COURT:  Are you aware what we need to

14 do to have him appear in state court for his state court

15 proceedings?

16                   MS. ROSALES:  Yes, sir.

17                   THE COURT:  What would we need to do to

18 make that happen?

19                   MS. ROSALES:  We would need to writ him

20 back, Your Honor.

21                   THE COURT:  And get the permission of

22 Judge Guaderrama?

23                   MS. ROSALES:  Yes, sir.

24                   THE COURT:  The record should reflect that

25 since your -- since you took office, not one pleading,

1  not one motion, not one request, not one business

2  record, not one proposed jury questionnaire, not one

3  subpoena duces tecum, not one witness list, not one

4  expert witness list has been filed by your office.

5          MS. ROSALES:  Those have been filed.  They

6  are filed, Your Honor.  We do have --

7          THE COURT:  If they were filed, they were

8  filed late yesterday because I checked the file.  Not

9  one.  And, Ms. Rosales, with all due respect, the worst

10 kept secret in the legal community is that you are

11 actively seeking, interviewing and attempting to hire

12 out-of-town lawyers that will be prosecuting this case.

13          Have you concluded that process?

14          MS. ROSALES:  We have additional attorneys

15 who will be assisting the current staff who are working.

16          THE COURT:  Have you concluded that

17 process?

18          MS. ROSALES:  No, sir, we have not.

19          THE COURT:  So there are currently

20 attorneys who will be on this case who are at this point

21 are not in your office and have not looked at one piece

22 of the evidence in this case?

23          MS. ROSALES:  No, sir.  We decided to have

24 an appellate attorney assigned to this case and there is

25 no need to have that appellate attorney on -- on record

1   at this point in time.

2                THE COURT:  And still you have gone

3   through the media to indicate you are ready to try this

4   case in the summer of 2023?

5                MS. ROSALES:  I have responded to

6   questions that have been posed to me by the media.

7                THE COURT:  And you did not confer with

8   defense counsel before you did that?

9                MS. ROSALES:  No, sir.

10               THE COURT:  And you definitely did not

11  bring it through this Court.

12               MS. ROSALES:  We have not had hearings in

13  this court, Your Honor, that is correct.

14               Again, with all due respect, Your Honor,

15  my statements were, "I hope that we can get this case

16  tried before or during the summer of 2023."  It is --

17               THE COURT:  And the proper -- I'm sorry.

18               MS. ROSALES:  I did not indicate that we

19  would be following through, but I did say or -- let me

20  rephrase that.  I did not say that a trial date was

21  scheduled.  I never said that this had already been

22  established.  I said it would be my hope that we could

23  have scheduling hearings so that we could have this case

24  heard for trial during the summer of 2023 to bring

25  resolution to the victims of this case.

1          THE COURT:  And since you have given

2   statements indicating that you are -- that you

3   understand that all that goes through this court, can we

4   agree that the proper form and venue for those kinds of

5   discussions is in this court and not the media with the

6   other side involved?

7          MS. ROSALES:  I did indicate to the media

8   that we would have these discussions with opposing

9   counsel so that we could check calendars to verify that

10  everybody would be available for trial just as we do

11  with every other case, Your Honor.

12         THE COURT:  You would also agree that is

13  nowhere in your press statement that was released this

14  week?

15         MS. ROSALES:  I would have to confer, but

16  that part of it was probably not in the press statement.

17         THE COURT:  Mr. Stevens, Mr. Spencer,

18  Mr. Valenzuela, why have you not gone through the media

19  to let them know when you wish to go to trial?

20         MR. SPENCER:  Good morning, Your Honor.

21  Mark Stevens, Felix Valenzuela, Joe Spencer on behalf of

22  Patrick Crusius.  We did file a waiver and had signed by

23  Mr. Crusius waiving his presence and it was filed this

24  morning.

25         Your Honor, we are aware that it is

1  against the Rules of Professional Responsibility to

2  attempt to influence a jury panel by giving information

3  out to the media that could potentially taint the jury

4  panel.  When Judge Guaderrama set his order on June 24th

5  and set it for jury trial, as the Court has stated, it

6  was days after that that this press release came out.

7  The statement by the district attorney's office is

8  entirely unrealistic and very disingenuous to suggest a

9  trial date of the summer of 2023.  As the Court pointed

10  out, we went back through the docket.  This office --

11  this current administration has not filed one motion,

12  one pleading, one affidavit, one subpoena, has been no

13  filings whatsoever.

14          I heard Ms. Rosales say that she had.  I

15  haven't seen it.  If it was filed, it is not in the

16  district clerk's.  We have not received a copy of it.

17  In fact, the last filing that was done in this case was

18  done by the past administration.  That was in the --

19  that was a business record affidavit in September of

20  2020 and a response to our motion in June of 2020 almost

21  two years ago.  Even the past administration had not

22  filed anything, but certainly there is nothing in the

23  record that I have seen that this administration has

24  filed.

25          Mr. Crusius is in federal custody.  He has

1    been in federal custody for over two years.  The State

2    has made no effort to writ him over for any reason

3    whatsoever.  There has been no discussions with the

4    defense team about a potential trial date.  In making

5    the statement out publicly that this district attorney's

6    office did, I think they were attempting to usurp the

7    Court's duty of picking a trial date that is in

8    compliance with due process and the fundamental

9    principles that apply there.  The tenets of due process

10   that rest in this case will be tried over and over again

11   if it is not done properly.

12                Judge Guaderrama's order, Your Honor, was

13   very carefully crafted.  Judge Guaderrama is a very

14   experienced judge who has not only tried death penalty

15   cases, but has heard them as a judge and has tried them

16   as a lawyer.  And he states in his order very clearly

17   that the government has not made the decision as to the

18   authorization, but in setting the trial date when he set

19   it in January of 2024, he had to strike a balance.  And

20   he understands that the criminal justice system that

21   rightfully intends to protect the accused in an unjust

22   outcome by securing both procedural and substantive

23   rights.

24                Judge Guaderrama goes on and explains.

25   And all anybody had to do was read the order of

1    Judge Guaderrama to understand his analysis.  "The Fifth

2    Amendment due process right to a fair trial and the

3    Sixth Amendment right to effective assistance of

4    counsel, the Constitution mandates that a fair trial be

5    done for all criminal defendants."  He acknowledges

6    that, "This is a complex case.  The government spends

7    vast sums of money and employs a well-established

8    machinery to try a defendant in a crime.  The criminal

9    defendant must be given a chance to match that."

10            Your Honor, there has been over 1.7

11    million files of discovery.  In each file there could be

12    hundreds or thousands of pages.  There is a tremendous

13    amount of discovery in this case.  Judge Guaderrama is

14    aware of that.  He understands the range and depth of

15    the resources that are needed to properly defend this

16    case to avoid a retrial, to avoid this case being come

17    back, to bring judicial finality.  He understands that

18    judicial finality is paramount to this community, for

19    the victims and for the defendant.

20            Once more, Judge Guaderrama explains in

21    his order that the defense counsel has a sworn duty to

22    investigate exculpatory and mitigating evidence.  We

23    must.  We are mandated by the ABA, by our ethical

24    guidelines and by the guidelines that have been set by

25    the Supreme Court of what defense counsel must do to

1  prepare for a death penalty case.  And the State of
2  Texas has said they intend to seek death.
3              "It will take time," Judge Guaderrama
4  says.  He says, "It will take a substantial amount of
5  time."  So he strikes a date and he takes into account,
6  "Mr. Crusius' Fifth and Sixth Amendment rights are
7  preserved," and the balance that he must strike with
8  respect to bringing judicial finality to this court.
9              Judge Guaderrama understands that the
10 Court needs to assemble an unusually large jury panel.
11 He is talking about at least 1,000 jurors that are going
12 to be coming in.  The jury selection process,
13 Your Honor, I have been -- Mr. Quijano and I were in a
14 death penalty voir dire for 18 months.  I -- to hear the
15 district attorney's office say that they anticipate voir
16 dire in any death penalty case going two months, much
17 less a case of this magnitude that occurred on
18 August 3rd, it is going to take six to eight months in
19 my opinion, in my opinion.  And that is with due speed.
20 That is just the nature of the case that we have,
21 Your Honor.
22              Judge Guaderrama says that, "The Court is
23 sympathetic to the enormous amount of work that this
24 case requires," but he is striking a balance.
25 Judge Guaderrama renders his decision not for any

1   political reason, Judge, but because he understands that

2   he must make sure that this community receives judicial

3   finality and avoids the risk of having to do another

4   retrial and we go decades and decades of not having

5   finality in this case.

6           What has been recently in the news, the

7   Parkland shooter case where they just went through 1,800

8   jurors to select a jury.  And they just selected a jury.

9   The Bowers case, which is in Philadelphia, which is the

10  synagogue shooting up there, where we had 11 deceased

11  individuals, Your Honor, there has been over 1,000

12  pleadings filed in that case.  We anticipate that there

13  is going to be heavy litigation that is going to be

14  done.  This defense team for the next 18 months is going

15  on a fast-track litigation scheme with the federal

16  government.  There is no way that we can also prepare

17  for a state case as well as a federal case.  And I would

18  think that the district attorney's office would be

19  sympathetic.

20          The district attorney's office was aware

21  that when Judge Guaderrama first writted Patrick Crusius

22  over to the federal court where we had the first --

23  after the indictment and the hearing that we have had in

24  federal court several years ago, they were -- they

25  acted -- they were aware.  It was pretty much common

1  knowledge that the federal case was going to go first

2  before the state case.  I would suggest to the Court

3  that the district attorney's office agreed with that.

4  They certainly by their actions -- and when I say "by

5  their actions," by their inactions, of not doing

6  anything to try to get Patrick Crusius writted over

7  here, have a hearing before the Court, request any sort

8  of scheduling conference, request any sort of trial

9  date, request any judge's conference, they would have

10  done that.  They would have writted him over and made

11  that request.  They didn't do that.  They acquiesced to

12  the federal government.  Well, now Judge Guaderrama has

13  given us a timeline.  And under his order he has ordered

14  us to come up with a scheduling order to prepare for

15  this trial.  It is impossible for us to have a trial

16  date set in this state court.

17              So, Judge, all of this is information that

18  the lawyers know and that the judges know.  The public

19  does not know.  We make -- take great pains to avoid a

20  lot of this information to the public so that we don't

21  taint a jury pool.  It is important that the jurors --

22  that this community tries this case.  It is important

23  and the defense from day one has stated, "We believe

24  this case needs to be tried in this community.  We

25  believe this case has to have judicial resolution in

1  this community."  We have taken great effort to do that.

2  That is why we have not sent out press releases.  That

3  is why we have not done press conferences.  That is why

4  we have not done interviews because we understand it

5  could potentially taint the jury pool.  We have an

6  ethical obligation to protect our client and to make

7  sure that the integrity of the court system is done

8  within the canons of ethics and what is required so that

9  all parties receive a fair trial and expeditiously as

10  possible.

11          THE COURT:  This Court wants to make it

12  perfectly clear that this case is not going to be tried

13  in the media, but will be tried in a court of law, in

14  this court of law where all of these types of

15  discussions should be happening.  Never in my 26 years

16  on the bench have I had to resort to the order that I

17  have this morning entered in this case.  It is an order

18  restraining parties from making extrajudicial

19  statements, which is commonly known as a gag order.

20  Please read my order very carefully because it not only

21  applies to the lawyers, but to the people who are

22  working with the lawyers or who are aligned with the

23  parties.

24          This Court has every intention of

25  enforcing its orders.  I want one more thing made

1   perfectly clear.  This Court continues to prepare for

2   the trial of this case, but this Court is not going to

3   interfere with the federal trial that has been scheduled

4   in January of 2024.  The grandstanding ends today.

5                 Please have a safe and happy 4th of July.

6                 This hearing is adjourned.

7                 THE BAILIFF:  All rise.

8                 (Proceedings concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   STATE OF TEXAS                )

2   COUNTY OF EL PASO             )

3

4       I, Natalie A. Martinez, Official Court Reporter in

5   and for the 409th District Court of El Paso County,

6   State of Texas, do hereby certify that the above and

7   foregoing contains a true and correct transcription of

8   all portions of evidence and other proceedings requested

9   in writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, offered by the respective parties.

16      I further certify that the total cost for the

17  preparation of this Reporter's Record is $85.50 and was

18  paid/will be paid by El Paso District Attorney's Office.

19      WITNESS MY OFFICIAL HAND this the 14th day of

20  July, 2022.

21

22

23                      /s/ Natalie A. Martinez, CSR
                        NATALIE MARTINEZ, Texas CSR# 8352
24                      409th District Court
                        El Paso, TX  79901 (915) 834-8209
25                      Expires:  September 30, 2023
```

El Paso County - 409th District Court

Filed 8/17/2022 2:17 PM
NORMA FAVELA BARCELEAU
District Clerk
El Paso County
20200D02631

## IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS
### 409ᵀᴴ JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | |
| | ) | |
| | ) | |
| VS. | ) | No. 20200D02631 |
| | ) | |
| | ) | |
| PATRICK WOOD CRUSIUS | | |

## ORDER

On this day, the Court, sua sponte, has appointed Justin B. Underwood, to represent the Hoffman family in any future proceeding that may arise in this cause.

ENTERED this the ____17____ day of ____Aug____, 2022

**SAM MEDRANO, JR.**
**409ᵀᴴ DISTRICT JUDGE**

El Paso County - 409th District Court

Filed 9/7/2022 11:13 AM
NORMA FAVELA BARCELEAU
District Clerk
El Paso County
20200D02631

IN THE 409TH DISTRICT COURT
EL PASO COUNTY, TEXAS

THE STATE OF TEXAS

v.

PATRICK WOOD CRUSIUS

CAUSE NO. 20200D02631

## STATE'S MOTION TO QUASH SUBPOENAS

Comes now the State of Texas, by and through its Assistant District Attorney, and files this Motion to quash subpoenas issued herein by Justin Underwood, Attorney at Law. The State would show the following:

### I. PROCEDURAL HISTORY

The above cause is set for a status hearing on September 13, 2022.  No evidentiary hearing is set for that day.

Attorney Justin Underwood was appointed sua sponte on August 17, 2022 by Order of this Court as attorney to represent "the Hoffman family in any future proceeding that may arise in this cause."

Thereafter, on August 23, 2022, the Court and the District Attorney's Office both received an email communication from Jose Morales, an attorney in Mexico, stating that he had been retained by the Hoffman family and that they rejected Mr. Underwood's representation in regard to the above-captioned matter.

Subsequently, on September 6, 2022, Mr. Underwood caused subpoenas to be issued for the status hearing on September 13, 2022.  Subpoenas were issued for John Briggs, District Attorney Yvonne Rosales, and Judge Roger Rodriguez.

### II. ARGUMENTS

The State respectfully requests that these subpoenas be quashed for the following reasons:

1. Mr. Underwood currently has no standing to subpoena anyone in relation to the above-captioned matter, as his appointment and representation have been rejected by the Hoffman family, and he therefore cannot ethically represent them under the Rules of Professional Conduct.  He is therefore improperly

acting under color of representation of a client who has rejected that representation.   See attached email from Attorney Jose Morales.

2. Furthermore, pursuant to Article 24.03 of the Texas Code of Criminal Procedure, only the defendant or his attorney or the State's attorney may make application for the issuance of subpoenas in a criminal case. This is a criminal case. Mr. Underwood is not the defendant, nor the defendant's attorney, nor the attorney for the State of Texas. Therefore, he is not an entity authorized by Article 24.03 of the Texas Code of Criminal Procedure to seek issuance of subpoenas in a criminal case.   The subpoenas should be quashed on this ground alone.

3. Additionally, Article 1, Section 30(e) of the Texas Constitution provides, in relevant part:  "A victim or guardian or legal representative of a victim has standing to enforce the rights enumerated in this section but *does not have standing to participate as a party in a criminal proceeding* or to contest the disposition of any charge."  Thus, Mr. Underwood, who is not even a legal representative of a victim, a party, or anyone else in this case, wholly lacks standing to request the issuance of subpoenas in the underlying criminal case.

4. Beyond that, Article 24.03 of the Texas Code of Criminal Procedure requires that any application for subpoenas in a criminal case shall state that the testimony of said witness is material to the State or to the defense.  The subpoenas actually issued pursuant to Mr. Underwood's application state that the testimony of the witnesses is material to the State.  However, since Mr. Underwood is not an attorney for the State of Texas in the above-entitled cause, this statement of materiality is inherently defective and not in accordance with the requirements of the Code of Criminal Procedure.

5. None of the individuals that Mr. Underwood is seeking to subpoena are fact witnesses in regard to the allegations in this case.  John Briggs was formally an Assistant District Attorney assigned to this case.  District Attorney Yvonne Rosales is the elected District Attorney for the 34th Judicial District of Texas. Judge Roger Rodriguez is not a party to this case.  There is no material testimony that can be obtained from these persons, particularly since the scheduled hearing is styled as a status hearing, rather than any sort of evidentiary hearing.  The subpoenas also fail to comply with the requirements of the Code of Criminal Procedure on these grounds.

6. Rather than representing the Hoffman family, Mr. Underwood is attempting to use his sua sponte appointment by the Court, and the agency created thereby, to conduct an extrajudicial investigation.  It is a reasonable inference that the extrajudicial investigation that Mr. Underwood is attempting to

engage in via these subpoenas is motivated by some desire other than representation of the Hoffman family.

### III. PRAYER

Wherefore, the State of Texas respectfully requests this Court GRANT its motion to quash subpoenas.

Respectfully submitted,

/s/ Curtis Cox
**CURTIS COX**
Assistant District Attorney
State Bar No. 24047797
500 E. San Antonio Ave., Suite 201
El Paso, Texas 79901
Phone: (915) 546-2059
Fax: (915) 533-5520
ccox@epcounty.com

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was e-filed and served on Mark Stevens (mark@markstevenslaw.com), Joe Spencer (Joe@joespencerlaw.com), and Felix Valenzuela (felix@valenzuela-law.com), attorneys for Defendant, and on Justin Underwood (reception@wutrial.com), Attorney at Law, on September 7, 2022.

/s/ Curtis Cox
CURTIS COX
Assistant District Attorney

**Curtis Cox**

**From:** Jose Morales <joserufinomoralesguzman@gmail.com>
**Sent:** Tuesday, August 23, 2022 4:07 PM
**To:** Aracely Gomez <aragomez@epcounty.com>; El Paso District Attorney <DARosales@epcounty.com>
**Subject:** Rejection of Appointed lawyer Justin Underwood

> Some people who received this message don't often get email from joserufinomoralesguzman@gmail.com. Learn why this is important

To Judge Medrano:

My law office represents the Hoffmann family. They have no intention of returning for anymore court proceedings since they do not feel safe. I am writing you this letter to let you know the Hoffmann family is aware you appointed a lawyer to represent them through a News story. They reject the appointment of this lawyer Justin Underwood, who they know to not have theyre best interests. They know this because they made a complaint against you and therefore they know any lawyer you picked can only act in retaliation of that complaint.

Any further act by this lawyer and or the court to antagonize and retaliate against the Hoffmann family will be seen as an extraterritorial act against free and sovereign citizens of the Republic of México and will be reported to the Mexican authorities for prosecution. We are Copying the State Comission of Judicial Conduct regarding the above retaliation, and also the office of the district attorney.

Yours truly,

Jose Morales
Abogado