UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | |
| | § | EP-20-CR-00389-DCG |
| PATRICK WOOD CRUSIUS, | § | |
| | § | |
| *Defendant*. | § | |

## NOTICE REGARDING DISCLOSURE OF AMOUNT PAID TO DEFENDANT'S APPOINTED COUNSEL AND SERVICE PROVIDERS

The Court has received requests to unseal certain records and information in the above-captioned case. From the date this Court sentenced Defendant Patrick Wood Crusius, the Court and its staff have been diligently reviewing each document under seal to determine whether applicable law permits, requires, or forbids the Court from publicly disclosing sealed filings. This Notice only addresses media requests to disclose the total dollar amount that Defendant's defense team incurred (*i.e.*, the amounts paid to Defendant's appointed attorneys and expert service providers). The Court will address all other requests separately.[1]

Defendant opposes the disclosure of the amount spent on his defense during this federal criminal prosecution. Defendant still faces a death penalty prosecution in *state* court and fears that revealing the amounts his defense team expended in his *federal* prosecution could prejudice his defense in the ongoing state proceedings.[2]

---

[1] *E.g.*, the Court will address the Government's Motion to Unseal, *see* ECF No. 308, and El Paso Matters' Motion for Leave, *see* ECF No. 311, in a separate order.

[2] *See* Objs. to Public Disclosure of Att'y & Expert Service Provider Payments, ECF No. 309; Objs. to Public Disclosure of Sealed, *Ex Parte* Pleadings, ECF No. 310.

There are two applicable statutes "that cooperate to provide for the appointment and compensation of counsel for indigent defendants" in federal criminal prosecutions.[3]

> The first, [the Criminal Justice Act ("CJA") under] 18 U.S.C. § 3006A, generally provides for the appointment of counsel in federal criminal cases and sets guidelines for compensation and reimbursement of expenses. In contrast, 18 U.S.C. § 3599 expounds upon § 3006A and specifically governs the payment of fees to appointed counsel in federal *capital* cases.[4]

Accordingly, while "prior versions of . . . § 3006A encompassed the appointment of representation in *all* federal criminal cases[,] Congress separately enacted § 3599 to ensure capital defendants received enhanced representation given the stakes of their litigation" in capital cases.[5] Thus, because the Government charged Defendant with a crime potentially punishable by death in this case,[6] 18 U.S.C. § 3599 governs if and when the Court must disclose the amounts paid for Defendant's defense as the media requests.[7]

---

[3] *Ottinger v. United States*, 164 Fed. Cl. 379, 381 (2023).

[4] *Id*.

[5] *Id.* at 385; *see also id.* at 382 ("Before 1988, the CJA of 1964 governed the appointment of counsel in all federal criminal cases and habeas litigation, regardless of whether the matter involved a capital or non-capital offense. In 2006, Congress enacted § 3599 *which clarified rights afforded* to a defendant charged or convicted of crimes punishable by death. In enacting these separate laws, Congress sought to provide capital defendants with experienced counsel and reasonably necessary litigation resources." (emphasis added) (cleaned up) (quoting *Martel v. Clair*, 565 U.S. 648, 658 (2012))).

[6] Although the Government opted not to pursue the death penalty in this case, § 3599 still applies because Defendant was *charged* with a crime which may be punishable by death. *See* 18 U.S.C. § 3599(a)(1) ("[I]n every criminal action in which a defendant is *charged with a crime which may be punishable by death*, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time . . . shall be entitled to the appointment or one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f)." (emphasis added)).

*See also* Superseding Indictment, ECF No. 82 (identifying counts 24-46 as offenses that carry a possible penalty of death); Order Appointing Counsel, ECF No. 27 (appointing counsel under § 3599); Order File Notice, ECF No. 239 (indicating that the Government could have pursued the death penalty in this case).

[7] *See Martel*, 565 U.S. at 659 ("Congress enacted the legislation now known as § 3599 to govern appointment of counsel in capital cases, thus *displacing* § 3006A for persons facing execution." (emphasis added)).

Only one subsection of the statute, (g)(3), addresses public disclosure of the amounts paid for defense costs. In relevant part, the statute provides that the fees and expenses paid both to attorneys and for any investigative, expert, or other reasonably necessary services "shall be disclosed to the public, after the disposition of the petition."[8] The plain text, however, does not define "petition" or designate the point at which the "disposition of the petition" in a case occurs.

To answer those questions, the Court will consult the Guide to Judiciary Policy, Volume 7, Part A ("CJA Guidelines")[9] promulgated by the Judicial Conference, which other courts have consulted for guidance when interpreting and applying § 3006A and § 3599.[10] In "set[ting] forth

---

[8] 18 U.S.C. § 3599(g)(3).

[9] At an earlier phase of this case (but in a different context), the Court held that the CJA Guidelines are "entitled to respectful consideration" but are not binding on the Court. *See United States v. Crusius*, EP-20-CR-00389-DCG, 2020 WL 4340550, at *6 (W.D. Tex. July 28, 2020) (quoting *United States v. Slone*, 969 F. Supp. 2d 830, 833 (E.D. Ky. 2013)). There, Defendant relied on the CJA Guidelines when asking the Court to reschedule the date of the Government's pre-authorization mitigation presentation—which is essentially a conference during which defense counsel has "an opportunity to submit and present any mitigating evidence that would militate against a death sentence" before the Government decides whether to pursue the death penalty. *Id*. at *1. The Court denied Defendant's motion and held that neither the CJA Guidelines nor any other statute authorized courts to "commandeer the scheduling of the pre-authorization mitigation presentation from the Government." *Id.* at *7.

The Court's earlier ruling that the CJA Guidelines aren't binding is fully consistent with the Court's decision to consult the CJA Guidelines today. There, the Court lacked authority altogether to grant the relief Defendant sought "because the pre-authorization mitigation presentation is not a judicial proceeding presided over by a judge, but part of an administrative, discretionary decision-making process of whether to seek the death penalty." *Id.* at *4 (quoting *United States v. Shakir*, 113 F. Supp. 2d 1182, 1188 (M.D. Tenn. 2000)). Here, on the other hand, the Court is statutorily authorized to disclose information on defense costs; the Court therefore considers CJA Guidelines to *clarify* its duties rather than create new ones. The Court's consideration of the CJA Guidelines in this context accords with the Supreme Court's instruction in a different context that "the policy conclusions of the Judicial Conference" are "entitled to respectful consideration" even though they are "not binding on the lower courts." *See Hollingsworth v. Perry*, 558 U.S. 183, 193 (2010) (cleaned up) (quoting *In re Sony BMG Music Ent.*, 564 F.3d 1, 6 (1st Cir. 2009)).

[10] *See, e.g.*, *Ottinger*, 164 Fed. Cl. at 382 ("The CJA authorizes the Judicial Conference, a congressionally-created policymaking body for the federal courts, to issue rules and regulations governing the operation of plans formulated under the CJA. Under this authority, the Judicial Conference promulgates a comprehensive regulatory framework for administering the CJA that is set out in [the CJA Guidelines,] which afford guidance to courts for creating and maintaining a CJA plan." (cleaned up) (quoting *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461 (3d Cir. 2015))).

the policy on the public disclosure of information pertaining to the activities under the Criminal Justice Act . . . and related statutes" like § 3599,[11] the Guidelines specify that in capital cases, disclosure of payments to attorneys and service providers "must be **after** the disposition of the petition *for habeas corpus*."[12]  The Guidelines thus clarify that "petition" in § 3599(g)(3) means "petition for habeas corpus," and the Court agrees with that interpretation.[13]

---

*See also id.* at 382 n.3 ("The CJA Guidelines, as well as the CJA Plans, address appointment and compensation of counsel in capital proceedings." (first citing Jud. Council of the Fifth Circuit, *Plan for Representation on Appeal Under the Criminal Justice Act*, (Oct. 7, 2021) (Fifth Circuit CJA Plan), https://www.lb5.uscourts.gov/cja2/CJADocs/CircuitCJAPlan.pdf (last visited Jan. 30, 2023); then citing CJA Guidelines, Vol. 7A, §§ 620, 630; Fifth Circuit CJA Plan §§ 3, 5.B., 7)).

[11] CJA Guidelines § 510.10.

[12] *Id.* at §§ 520.10(b), 530(b) (second emphasis added).

In a petition for habeas corpus, an individual in custody moves the court to vacate, set aside, or correct his sentence.  *See, e.g.*, 28 U.S.C. § 2255.  As a post-conviction remedy, a habeas corpus petition may be a prisoner's final opportunity to challenge his incarceration and obtain relief (*i.e.*, a reduced prison sentence or a voided conviction) once appeals have been exhausted, or when a direct appeal is unavailable.  *See, e.g.*, *Rodriguez v. Fla. Dep't Corr.*, 748 F.3d 1073, 1080 (11th Cir. 2014) ("Federal habeas corpus proceedings are the last chance a petitioner has to present arguable constitutional violations and errors to a court capable of correcting them.").

[13] The Court concedes that its interpretation of § 3599(g)(3) differs from that of at least one other court.  In *United States v. Tsarnaev*, the District of Massachusetts concluded that § 3599(g)(3)'s "after the disposition of the petition" language should not be "[t]aken literally . . . to apply only to cases involving an actual habeas 'petition.'"  No. 13-10200, 2016 WL 4994954, at *1 (D. Mass. Sept. 16, 2016).  The *Tsarnaev* court reasoned that § 3599(g)(3) "was enacted as part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ('AEDPA')," and that Congress was therefore "focused on expediting capital habeas procedures" when it drafted § 3599(g)(3)'s "after the disposition of the petition" language.  *Id.*  The *Tsarnaev* court therefore surmised that Congress's "use of the term 'petition' in § 3599(g)(3)" reflects "an inadvertent reflection of that focus" on habeas procedures.  Because the *Tsarnaev* court found "no objective indications in the legislative record that Congress meant" to require federal courts to disclose capital defense costs in cases where the defendant files a habeas petition—while keeping that information private if the defendant never files a habeas petition—the District of Massachusetts concluded "that the phrase 'after the disposition of the petition' is a slip of the legislative pen"—*i.e.*, a "drafting error."  *Id.* at *1 & n.2.  Thus, reasoned the *Tsarnaev* court, courts should not interpret "after the disposition of the petition" literally, but should instead read § 3599(g)(3) more loosely to mandate financial disclosures "after the case is over" (irrespective of whether the defendant ultimately files a habeas petition).  *Id.* at *1.

The Court respectfully rejects *Tsarnaev*'s conclusion that § 3599(g)(3)'s "after the disposition of the petition" language is a drafting mistake that federal courts have the authority to correct or overlook.  Although it's true that courts may disregard "obvious technical drafting errors" when interpreting statutes under the "scrivener's error" doctrine, that rule only applies "in exceptional circumstances" that aren't present here.  *See Niz-Chavez v. Garland*, 593 U.S. 155, 161 n.1 (2021); *see also, e.g.*, *DaimlerChrysler Fin. Servs. Ams., LLC v. Miller (In re Miller)*, 570 F.3d 633, 639 (5th Cir. 2009) (opining that "[i]f

Still, § 3599 contains a statutory gap, as the plain text does not make clear—by specifying the *latest* date by which the Court *must* disclose the amounts paid under § 3599—whether the Court *may* disclose the amounts paid any earlier or whether it is explicitly foreclosed from doing so.  At least one court has concluded that courts have discretion to disclose

---

Congress enact[s] into law something different from what it intended," the federal courts possess no wide-ranging authority "to rescue Congress from its drafting errors" by "rewriting [the] rules" (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004))).  A court may dismiss otherwise unambiguous statutory text as a mere drafting mistake only when "the error . . . is so 'unthinkable' that any reasonable reader would know immediately both (1) that it contains a 'technical or ministerial' mistake, and (2) the correct meaning of the text." *Lexington Ins. Co. v. Precision Drilling Co.*, 830 F.3d 1219, 1223 (10th Cir. 2016) (Gorsuch, J.) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 237-38 (2012)); *see also, e.g.*, *United States v. Lauderdale County*, 914 F.3d 960, 962 n.2 (5th Cir. 2019) (appearing to adopt a similar conception of the scrivener's error doctrine).  So, for instance, if a statute "provide[d] that the '*winning* party' . . . must pay the other side's reasonable attorney's fees," it would be "plain to any reasonable reader" that Congress meant to say "*losing* party." *Lexington*, 830 F.3d at 1223 (emphases added).

Applying those principles here, the fact that a reader would have to know the context surrounding AEDPA's enactment in order to adopt *Tsarnaev*'s preferred interpretation of the statute illustrates that the "correct meaning" of the statute would not be "immediately" obvious to "any reasonable reader."

Furthermore, it is not "unthinkable" that Congress would mandate the disclosure of financial information only in cases where a capital defendant files a habeas petition.  Habeas petitions are often a capital defendant's final opportunity to challenge his conviction before being executed.  *See Fla. Dep't Corr.*, 748 F.3d at 1080.  These petitions, however, may come years after a defendant is convicted and sentenced.  *See United States v. Rodriguez*, 858 F.3d 960, 962 (5th Cir. 2017) (indicating the one-year period to seek post-conviction relief runs from the *latest* of four possible dates, "one of which is the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence" (cleaned up) (quoting 28 U.S.C. § 2255(f)(4))); *see also In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) (finding the time limitation to file a habeas petition did not start until approximately ten years after capital defendant had been sentenced to death because witnesses coming forward and recanting their prior testimony served as "newly discovered evidence").  In only requiring disclosure from capital defendants whose habeas petitions the court has already disposed of, Congress may have intended to shield a defendant from public disclosure up until his execution is finalized (*i.e.*, all other remedies are exhausted)—however long that may be from the date of sentencing.

Because *Tsarnaev* thus incorrectly applied the scrivener's error doctrine, Court must enforce the statutory text as written.

Notably, the *Williams* case cited below accords with this Court's conclusion that the term "petition" refers to a habeas corpus petition.  *See United States v. Williams*, No. 06-00079 JMS/KSC, 2014 WL 2932365, at *1 (D. Haw. June 30, 2014).

information relating to defense costs *before* disposing of a defendant's petition for habeas corpus.[14]

The Court need not now decide whether it may disclose the information sought under § 3599 before Defendant files a petition for habeas corpus and the Court disposes of it. Even assuming *arguendo* that the Court does in fact have the discretion to disclose the amounts paid toward Defendant's defense, the Court would not exercise such discretion at this time. Defendant is currently facing the death penalty in an on-going state prosecution. Although disclosing the *total* defense costs expended in this federal prosecution wouldn't compromise the defense team's strategy in the state case (because disclosing the non-itemized total wouldn't reveal *how* the federal defense team spent that money), releasing the total federal defense costs now would unnecessarily generate additional pre-trial publicity that could make it harder for the state court to select an impartial jury.[15] The Court will therefore revisit whether to disclose the amounts as the state case progresses.

**So ORDERED and SIGNED this 17th day of January 2024.**

_____
**DAVID C. GUADERRAMA
SENIOR U.S. DISTRICT JUDGE**

---

[14] *See Williams*, 2014 WL 2932365, at *2 (holding that § 3599(g)(3) "does not preclude disclosure of the amounts of defense fees and costs before the disposition of any petition that might be filed in this case" because § 3599(g)(3) merely "provides that the court *must* make [the required] disclosure after disposition of the habeas petition, and leaves silent whether the court *may* exercise its discretion in disclosing such information earlier").

[15] *Cf. United States v. Brown*, 218 F.3d 415, 423 (5th Cir. 2000) ("Intense publicity surrounding a criminal proceeding . . . poses significant and well-known dangers to a fair trial . . . [as there is] the potential that pretrial publicity may taint the jury venire, resulting in a jury that is biased toward one party or another."); *United States v. McVeigh*, 918 F. Supp. 1452, 1465 (W.D. Okla. 1996) (identifying problems that may occur when courts reveal total defense costs before a death penalty trial ).